403 So.2d 1157 (1981)
STATE of Louisiana
v.
Larry Don PETTERWAY.
No. 80-KA-2677.
Supreme Court of Louisiana.
June 22, 1981.
Rehearing Denied September 4, 1981.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Henry N.
*1158 Brown, Jr., Dist. Atty., A. L. Blondeau, Asst. Dist. Atty., for plaintiff-appellee.
James R. Phillips, Indigent Defender Board, Bossier City, for defendant-appellant.
CALOGERO, Justice.[*]
The Grand Jury of Bossier Parish returned a true bill against defendant Larry Don Petterway charging him with the aggravated rape of a nine year old boy in violation of R.S. 14:42. The trial court denied defendant's motion to suppress inculpatory statements. Defendant then entered a guilty plea to the lesser included charge of attempted aggravated rape reserving the right to appeal the adverse ruling on the motion to suppress. State v. Crosby, 338 So.2d 584 (La.1976). The trial judge sentenced defendant to forty years at hard labor.
Officers from the Shreveport Police Department and the Bossier Parish Sheriff's Department arrested defendant at his Shreveport apartment. The police read defendant the Miranda rights and asked him whether he understood those rights. He indicated that he did and signed a waiver of rights form. Deputy Alton L. Luce of the Bossier Parish Sheriff's Department transported defendant to the Bossier Parish Sheriff's Office in Benton, Louisiana. Defendant made two inculpatory statements: one oral on the way to Benton and one recorded after reaching Benton. Defendant contends that en route to Benton he was threatened and received promises which induced him to make the inculpatory statements he now seeks to have suppressed.
At the hearing on the motion to suppress, defendant and Deputy Luce testified to widely divergent versions of what transpired during the trip to Benton. According to defendant, Deputy Luce promised to have the aggravated rape charge reduced to contributing to the delinquency of a minor in return for a statement. Defendant also stated that the deputy told him that the penalty for aggravated rape was the electric chair. Furthermore, defendant alleged that Deputy Luce told him that the other prisoners would attack him nightly.
For his part, Deputy Luce categorically denied that he had promised to have the charge reduced or that he had informed defendant that the electric chair awaited him if convicted of aggravated rape. In response to defendant's allegation about the threat of nightly attacks, Deputy Luce denied making such a threat but admitted that he told defendant "jail was not a pleasant place to be." The deputy also said that he told defendant that "things would go easier for him" if he cooperated.
Only Deputy Luce and defendant were present at the time that the above conversation took place during which defendant contends that promises and threats were made. Therefore, the trial judge had to decide the matter based upon his assessment of the credibility of the witnesses.
Defendant stated that he did not pay attention to the reading of the Miranda rights, but did admit that the signature on the waiver card was his. This defendant is a high school graduate. He also completed a home nursing course. We are not here dealing with an illiterate individual. The defendant had telephoned and talked with his parents before leaving his apartment for the ride to Benton with Deputy Luce. Finally, defendant admitted that he had been arrested more than once before and had received Miranda rights at those times although he protested that he had not paid attention then either.
Regarding the alleged promise of a reduced charge, defendant first testified that no promises about the charge had been made, but he then changed his testimony to state that Deputy Luce had promised the reduced charge in return for a statement. Defendant told the judge that no rape had *1159 taken place but that he had included in the statement whatever Deputy Luce informed him the victim's story had been.
Deputy Thiebaud, also of the Bossier Parish Sheriff's Department, confirmed that defendant had been given the Miranda rights while still at his apartment and that defendant signed the waiver card at that time. Deputy Thiebaud described the apartment as quite small and said that he could hear virtually everything that was said even while he was executing a search warrant in another room. According to this witness, no threats or promises were made at the apartment and defendant does not contend otherwise.
Before the state can introduce an inculpatory statement made in police custody, it bears the heavy burden of establishing that defendant received Miranda warnings and that the statement was freely and voluntarily made and not the product of promises, threats or duress. C.Cr.P. art. 703; R.S. 15:451; State v. Bell, 395 So.2d 805 (La.1981). Once a defendant alleges specific instances of police misconduct in reference to the statement, it is incumbent upon the state to rebut specifically each such instance. State v. Dison, 396 So.2d 1254 (La.1981), State v. Franklin, 381 So.2d 826 (La.1980).
Our inquiry focuses entirely upon the time that defendant and Deputy Luce were alone together because defendant alleges the misconduct transpired during this period of time. Defendant suggests that in such a one on one situation the state cannot meet its burden of showing that the statement is free and voluntary because there are no witnesses to confirm the deputy's version of events.
In denying the motion to suppress, the trial court stressed defendant's education and the fact that he had again been given the Miranda warnings and signed a second waiver of rights form in Benton before making the recorded statement. On appellate review, the trial judge's determination of credibility is accorded great weight and will not be disturbed unless not supported by the evidence. State v. Haynie, 395 So.2d 669 (La.1981); State v. Manning, 380 So.2d 46 (La.1980).
We note that defendant did receive Miranda warnings and did sign a waiver of rights form on two separate occasions. We are not impressed by defendant's allegation that Deputy Luce promised to have the charge reduced to contributing to the delinquency of a minor when our review of the record indicates that initially defendant testified that he had received no promises regarding a reduced charge.
We are concerned, however, by Deputy Luce's admitted statement to defendant that things would go easier for him if he cooperated. Deputy Luce explained that he meant that defendant should give a statement and tell the truth. Recently we have considered two cases in which similar "promises" were allegedly made by the authorities. In State v. Huff, 392 So.2d 1046 (La.1981), that defendant contended that the sheriff had told him that he might avoid federal prison or Angola if he cooperated. We found that the sheriff denied making such a promise and testified that he had specifically told Huff that he couldn't promise anything. Considering the evidence, we held that Huff's confession was admissible.
In State v. Dison, supra, the sheriff admitted telling the defendant that "in the past, anybody that tried to help themselves, usually got help." Dison, 396 So.2d at 1258. A deputy had also told that defendant that if he cooperated, the deputy would do what he could to help. Both officers testified, however, that they had told defendant that they could promise him nothing. Based upon the totality of the circumstances, we held that Dison's confession was admissible.
In the instant case, Deputy Luce did not specifically admonish defendant that he could make no promises. However, he did not make a specific promise to defendant or say anything which could be construed to be a promise. Deputy Luce did not have repeated interviews with defendant before obtaining the statements. Defendant's will was not overborne by exposure to numerous policemen. Instead defendant made his *1160 statement during his first exposure to a single policeman a very short time after his arrest. Deputy Luce's comment to the effect that defendant would be better off if he cooperated is very much like the statement in Dison that if the accused cooperated the deputy would do what he could to help. Statements of this type, rather than being promises or inducements designed to extract a confession, are more likely musings not much beyond what this defendant might well have concluded for himself.
There is an additional issue which we choose to address although not raised by the parties, that is, whether the seven member panel assigned to hear this case, comprised of four Supreme Court justices and three Court of Appeal judges sitting as Justices ad hoc, has the authority to hear and decide this case, and further whether such assignments are constitutional.
Legislative and Constitutional changes in 1980 place jurisdiction for appeals in most criminal cases in the Courts of Appeal of this state where formerly it had been in this Court. The transfer of criminal appellate jurisdiction becomes effective on July 1, 1982. In an effort to familiarize the Court of Appeal judges with criminal law and procedure and the internal processes of this Court in handling appeals in criminal cases, among other reasons, this Court adopted a procedure whereby three Court of Appeal judges would be assigned to sit with four Supreme Court justices to hear and decide criminal cases.
The authority of the Louisiana Supreme Court to make such assignments and the authority of these panels to hear and decide cases was attacked in State v. Bell, 395 So.2d 805 (La.1981), and State v. Claibon, 395 So.2d 770 (La.1981), in a "Motion to Vacate Appointments." In response to that motion, the Court rendered a unanimous opinion authored by Chief Justice Dixon which held that there was no merit to the motion for the reason that Article 5, § 5(A) of the Louisiana Constitution of 1974 provides, without qualification, that the Supreme Court "may assign a sitting or retired judge to any court" and that "the Court's power to assign judges to assist courts other than their own within the judicial branch in furtherance of the administration of justice is explicit and unfettered."
It has been contended that Bell and Claibon only addressed the issue of whether judges could be assigned to this Court without their consent. Our opinion in Bell and Claibon was not so limited. Rather, it was a holding by this Court that the assignment of three Court of Appeal judges to sit with four Supreme Court justices on criminal cases was in furtherance of the administration of justice, authorized by the Louisiana Constitution of 1974 and not in violation of it.
It has also been contended that the assignment of the Court of Appeal judges to this Court to serve on these seven member panels (two different panels, each with four Supreme Court justices and three Court of Appeal judges, justices ad hoc, hear one half the criminal cases orally argued each court cycle) violates the Equal Protection Clause and Due Process Clause of both the Louisiana Constitution (Article 1, § 5 and Article 1 §§ 2 and 22, respectively) and the United States Constitution (Amendment 14). Although this contention was not expressly addressed in the Bell/Claibon opinion it has been considered by this Court and found to be without merit.
There have been no reasons cited for the belief that the hearing and deciding of criminal cases by these panels violates the above Constitutional provisions except for the speculation that defendants with equally meritorious, or nonmeritorious, appeals might fare better or worse depending upon the identities of the justices and judges who compose the respective panels; and that different rulings on identical legal issues might be forthcoming from different panels. In contemplation of the possibility of this latter problem, inconsistent opinions coming from different panels, it is a part of the established procedure that the applications for rehearing in all of these criminal cases are considered by the seven permanent members of the Court, rather than the *1161 respective panels which first entertain the appeal.
Furthermore, since we are not dealing with a suspect class or a fundamental right (McKane v. Durston, 153 U.S. 684, 14 S.Ct. 913, 38 L.Ed. 867 (1894) differences in the appellate process are not prohibited where they have some relation to a rational policy of criminal appeals and do not amount to invidious discrimination. Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). Under the present scheme of assigning three Court of Appeal judges to the seven member panels, with different panels hearing and deciding one half of the criminal cases argued before the Court each Court cycle, it is possible that a given defendant's case might be viewed differently by one or the other of two differently composed panels. However, as stated above, all rehearing applications are considered by the regular seven member Court.
Additionally, it should be noted that the docketing of all cases is by a random process.
The reasons for and the institution of this temporary system (from December 1980 until some time in 1982 as presently contemplated) are consistent with and in furtherance of the administration of justice. More particularly we have not had called to our attention, nor do we find any plausible legal reasons or jurisprudential support in the federal jurisprudence or otherwise for the proposition that this system as adopted or implemented is constitutionally deficient on equal protection grounds.
Furthermore federal due process does not require a state in criminal cases or otherwise to provide an appellate system. Ortwein v. Schwab, 410 U.S. 656, 93 S.Ct. 1172, 35 L.Ed.2d 572 (1973). Due process only requires that such procedural rights, including appeal, as are instituted by law, be indiscriminately afforded each person attempting to exercise same. Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956). All criminal defendants entitled by law to an appeal to the Louisiana Supreme Court are being afforded that right, albeit under a temporarily changed system as described more fully hereinabove, and to a Supreme Court the composition of which has been effected by the Court's exercising its constitutional authority, Art. 5, § 5(A) of the Louisiana Constitution of 1974, to assign sitting judges to the Louisiana Supreme Court.

Decree
For the foregoing reasons, we find that the trial judge ruled correctly when he denied the motion to suppress. Consequently, defendant's conviction and sentence are affirmed.
AFFIRMED.
KLIEBERT, J., ad hoc, concurs and assigns reasons.
DENNIS, J., joins in the opinion insofar as it upholds the jurisdiction of this Court but respectfully dissents from the decision on the merits, being of the opinion that the inculpatory statement was not free and voluntary.
REDMANN, J. pro tem., dissents with reasons.
KLIEBERT, Justice ad hoc, concurring.
I concur in the affirmation of the trial judges' ruling for the reasons stated in the majority opinion and agree this Court has authority to assign Court of Appeal Judges to serve on this Court; but, do not join in the majority's address of the constitutional issues arising out of such appointments because the factual base necessary to decide whether the defendant's due process rights under the State and Federal Constitution have been violated is incomplete and the defendant has not as yet raised the issue as to a violation of his right to due process.
REDMANN, Justice Pro Tem., dissenting.
"It is the right of the accused to be tried by a legally constituted court, not by a *1162 kangaroo court."[1]Williams v. United States, 1951, 341 U.S. 97, 101, 71 S.Ct. 576, 579, 95 L.Ed. 774.
This "Louisiana Supreme Court" is not a legally constituted court. Worse, its members are not in fact allowed the power to decide the cases it hears. The only power this court derives from its colorable constitution by the elected Justices of the Louisiana Supreme Court is the power to declare itself unconstitutionally constituted and therefore without any jurisdiction to imprison any accused, and thus obliged, borrowing the words of Marbury v. Madison, 1803, 5 U.S. (1 Cranch) 137, 170, 2 L.Ed. 60, "to disclaim all pretensions to such a jurisdiction" as an "extravagance ... absurd and excessive ...."

Preliminary
The writer is obliged to point out that he, ordinarily a judge of the Louisiana Court of Appeal, Fourth Circuit, has been "assigned" to the Louisiana Supreme Court by its Order as a justice pro tempore. He is present on this court in obedience to and by force of that order, but he is not present as a judge of the Court of Appeal. He is present, and he acts, and he writes, in the capacity of a Justice pro tempore [or perhaps ad hoc[2]] of the Louisiana Supreme Court.

This Court's Composition
The Louisiana constitution decrees that "The judicial power is vested in a supreme court ... and other courts authorized by this Article," La.Const. art. 5 § 1; "The supreme court shall be composed of a chief justice and six associate justices, four of whom must concur to render judgment," art. 5, § 3; and "The state shall be divided into at least six supreme court districts, and at least one judge shall be elected from each," art. 5 § 4 (emphasis the writer's).
The present court is not so composed. It consists of four of the six elected associate justices and three Court of Appeal judges whom the seven elected justices have ordered to sit as "justices pro tempore" (or "justices ad hoc").
The seven elected Justices, in State v. Bell, La.1981, 395 So.2d 805, have ruled that because "without qualification" La.Const. art. 5, § 5(A) says that the Supreme Court "may assign a sitting or retired judge to any court," they have a "plenary power" to do so, a power that "is explicit and unfettered." By these words, Bell expressly asserts that this power knows no bounds.
Bell is wrong. There are limits on all sides.
First, there are the external impingements of reality: the Louisiana Supreme Court cannot pretend to have power to assign a Mississippi Justice of the Peace, or a local United States District Judge, to the Texas Supreme Court, or to the United States Supreme Court, or to the Cour de Cassation in Paris, or even to the Louisiana Supreme Court. Bell must be conceded to be wrong, at least to that extent, in its claim to "explicit and unfettered," "plenary power."
*1163 Second, there are further inferential limits upon the assignment of a "judge" to "any court" within the phrase itself. The meaning is that the judge must be assigned as a judge of the court to which assigned, and that the court must be an existing, legally established Louisiana court, "authorized by this Article [5]" of the Louisiana Constitution. Thus the justices of the Louisiana Supreme Court do not have the power to assign a judge to that Court to clerk their cases, cook their collards, cut their crabgrass, or clean their commodes. Nor do they have power to assign judges to a court of their creation, such as a "court of criminal appeals." Bell is wrong in claiming so "unfettered" an enfeoffment of inferior judges to the Louisiana Supreme Court.
Third, and more important, the Louisiana Constitution contains 14 Articles, each of which contains several sections, some of which in turn contain subdivisions. Article 5's section 5's subdivision (A)'s assignment clause is one of many, many provisions of that Constitution. Although the language of any clause of the constitution is presumably selected with the "utmost discrimination," Western Union T. Co. v. Railroad Comm., 1908, 120 La. 758, 45 So. 598, 599, the provisions of any one subdivision must be read in connection with all others, State v. City of Baton Rouge, 1949, 215 La. 315, 40 So.2d 477, and must be read in harmony with the whole instrument, Meyers v. Flournoy, 1946, 209 La. 812, 25 So.2d 601. The entire constitution is as binding on the Louisiana Supreme Court as on the executive and legislative departments of government, and on the people themselves, Graham v. Jones, 1941, 198 La. 507, 3 So.2d 761. The courts are obliged to follow the same rules of reasonable interpretation with the constitution as with other laws, State v. Baton Rouge, supra; Nicholson v. Thompson, La. 1843, 5 Rob. 367; and a construction with "unseemly and absurd consequences" must be avoided, Blessing v. Levy, 1949, 214 La. 856, 39 So.2d 84, 87; State v. Joseph, 1918, 143 La. 428, 78 So. 663.
La.Const. art. 5 §§ 1, 3, and 4 are the Louisiana constitutional bedrock for the composition of the Louisiana Supreme Court. None of those is even mentioned in the Bell case, yet each appears to conflict with Bell's theory that the Supreme Court's assignment power is unfettered and plenary.
Section 1 provides for "a supreme court," that is, one Supreme Court, preventing the elected Justices from erecting a second seven-person "Supreme Court" by assignment of seven other judges, and also from creating two additional "Supreme Courts" each month by supplanting three elected members with three different assigned judges twice every month for criminal hearings only; the Constitution provides "a supreme court," and the "judicial power" is only "vested in ... courts authorized by this Article," art. 5 § 1.
Section 3 provides that "The supreme court shall be composed of a chief justice and six associate justices," further suggesting that the "explicit and unfettered" assignment power does not authorize constituting the Supreme Court of nine or 13 justices by assigning other judges to be supernumerary justices. Nor, in my view, does the assignment power authorize displacing the Chief and two Associate Justices as has been done on this very court. It is an absurd construction that would allow a liberal majority of four Justices to "assign" the conservative minority of three Justices to the far marshes as Justices of the Peace, while "assigning" to the Supreme Court three judges known for their liberal views, so as to make "Louisiana Supreme Court" working conditions more agreeable and decisions more often unanimous. Moreover, § 3 requires in respect to the "chief justice and six associate justices" that "four of [them] must concur to render judgment," meaning, at least while there are seven elected Justices available, that four elected Justices must concur for the Supreme Court to adjudicate a case.
Section 4 requires that the state "be divided into at least six supreme court districts, and at least one judge shall be elected from each." It hardly should have to be said that the purpose of electing those *1164 judges is to have those judges serve as the Justices of the Court; and the purpose of electing them from geographical districts is to have the occasionally divergent views of different areas of the state represented (see VI Records of the Louisiana Constitutional Convention of 1973, 714-721, 30th Day's ProceedingsAugust 15, 1973). Section 4 thus imposes as a limit upon the assignment power that the elected Justices cannot assign other judges to do the work they have been elected to do; cannot substitute appointed judges for elected judges the Constitution so expressly requires. Additionally, if the election "districts and the number of judges assigned to each" are to be changed, it can only be "by law enacted by two-thirds of the elected members of each house of the legislature," § 4 declares.
La.Const. art. 5 § 23(A) provides "The retirement benefits and judicial service rights of a judge in office or retired on the effective date of this constitution shall not be diminished," and that too must be deemed a limit on the power to "assign a sitting or retired judge to any court." Is that power so unfettered that it can force a retired judge out of retirement, perhaps oblige him or her to return to Louisiana from a distant retirement haven? (And does not true disability, as by stroke or senility, also "limit" that unlimited power?)
La.Const. art. 5 § 5(D) (prior to its amendment effective July 1, 1982) provides that "a case shall be appealable to the supreme court"meaning the Supreme Court that art. 5, §§ 1, 3, and 4 describe and constitute"if ... (2) the defendant has been convicted of a felony or a fine exceeding five hundred dollars or imprisonment exceeding six months actually has been imposed." No person can be subjected to prosecution or be deprived of his liberty by Louisiana except in accord with the Louisiana Constitution and laws, State v. Kiffe, 1947, 210 La. 863, 28 So.2d 459; and when the Constitution requires different tribunals for different classes of offenses, that requirement constitutes a due process retirement that cannot be changed by the Legislature, State v. Jacques, 1931, 171 La. 994, 132 So. 657. Nor, by identical reasoning, can the Louisiana Supreme Court change that due process requirement by "assigning" other judges to hear the appeals the Constitution assigns to itself.
La.Const. art. 1 § 2 demands that "No person shall be deprived of life, liberty or property, except by due process of law" including, art. 1 § 19, "the right of judicial review based upon a complete record of all evidence upon which the judgment is based" and, of course the appeal to the Supreme Court provided by art. 5 § 5(D); see Jacques, supra. Furthermore, art. 1 § 22 requires that "All courts shall be open, and every person shall have adequate remedy by due process of law ... for injury to him in his person, property, reputation or other rights." These due process and open courts requirements further impose as a limit on the assignment power that it cannot be used to close the Supreme Court to an accused who has a Louisiana due process right to appeal to the Supreme Court for redress against a trial court conviction or sentence.
In sum, Bell's declarations that the Supreme Court's assignment power is "unfettered" and "plenary," and that otherwise-unmentioned[3] arguments to the contrary *1165 are "wholly without substance and merit," are simply not a reasonable response to a dead-serious problem of what appears to be a plainly unconstitutional exercise of the assignment power. To dismiss a question is not to answer it. As Justice Frankfurter observed, concurring in Joint Anti-Fascist R. Comm. v. McGrath, 1951, 341 U.S. 123, 171, 71 S.Ct. 624, 648, 95 L.Ed. 817, "The validity and moral authority of a conclusion largely depend on the mode by which it was reached." "Law is something more than mere will exerted as an act of power," Hurtado v. California, 1884, 110 U.S. 516, 535, 4 S.Ct. 111, 121, 28 L.Ed. 232.
What the authorized extent of the undoubtable power to "assign a sitting or retired judge to any court" may be is unnecessary here to decide. The Constitutional Convention transcript appended hereto does, however, offer several examples of its intended use. This writer has been assigned to the Supreme Court expressly under the assignment power of art. 5 § 5(A), and expressly to sit in place of Justice Blanche (who had to recuse himself because he had participated in the case in the Court of Appeal), in Cosey v. Cosey, La.1978, 376 So.2d 486.
Surely, the assignment power is "explicit": but it is not "unfettered" and "plenary" and it does not allow the composition of this court in contradiction to art. 5 §§ 1, 3 and 4 of the Louisiana Constitution. The elected Justices virtually so concede by their deeds in taking the decision of Bell away from the assigned Justices, and in taking every final decision away from the assigned Justices by removing them from the Court on applications for rehearing. They know that there is "a supreme court," La.Const. art. 5 § 1, with seven Justices "elected" from geographical districts, §§ 3 and 4. They know that they are the real Supreme Court, and that this Court is not.

Federal Due Process
It has been argued above that an accused is denied due process of law under the Louisiana Constitution by denying to him or her the appeal to the Louisiana Supreme Court that the Louisiana Constitution expressly grants. And it has just been noted that the elected Justices exercise a "disassignment" power to remove assigned Justices from the Court for applications for "rehearing."
The bifurcation of the Supreme Court into one that hears and one that decides criminal cases denies due process of law, La.Const. art. 1 §§ 2 and 22 and U.S.Const. Amend. 14, to an accused. If an accused is made to present his or her appeal from a criminal conviction to one state Supreme Court, due process requires that that court must have the authority to decide the appeal; and if instead a second Supreme Court has the authority to decide the appeal, due process requires a hearing for the accused (especially under La.Const. art. 1 § 22's "All courts shall be open") before that second Supreme Court rather than before the powerless first.
There remain yet to be mentioned some other factual matters that must further affect one's view of whether this Court can give due process.
*1166 The factual background for the assignment of Court of Appeal judges to participate in all of the criminal hearings of the Louisiana Supreme Court since December, 1980, includes a bitter battle between most Court of Appeal judges (not including this writer) and the Supreme Court Justices over a constitutional amendment to transfer most criminal appellate jurisdiction from the Supreme Court to the Courts of Appeal. That amendment passed the Legislature, although its effective date was postponed until July 1, 1982, and was adopted by the people on November 4, 1980. On November 26, 1980, by letter to the Chief Judges of the Courts of Appeal, the Chief Justice announced the Supreme Court's program of assigning Court of Appeal judges, six each month, to sit three at a time with "four members of this court"
to gain experience in handling criminal appeals [and to] ... afford members of this court a degree of relief.
There may be members of your court who would like to serve on the first panel, in December. If so, please let [Judicial Administrator] Gene Murret know right away, and we will make the assignments. If not, the assignments will be made more or less at random.
Thus ended the letter (the full text of which is Appendix B), making it clear that, notwithstanding that the Constitutional amendment would not give criminal jurisdiction to Courts of Appeal until July, 1982, the Supreme Court was going to give the criminal cases to the Court of Appeal judges beginning immediately.
When in January 1981 this writer was notified that he was to be assigned for May 21 and 22, 1981, he on January 19 wrote the elected Justices in some detail of his views on the constitutionality of so constituting the Louisiana Supreme Court. "[M]y tentative view is that the seven elected members of the Louisiana Supreme Court alone can constitute that Court in the absence of a vacancy. My present expectation, therefore, is that in acting under your order placing me on the Supreme Court pro tempore, I shall vote to hold the Court unconstitutionally constituted, and I shall therefore decline to participate in the consideration of the merits in each case in which I as a Court of Appeal Judge am ordered to act as a Supreme Court Justice pro tempore." (The full text is Appendix C.)
The Chief Justice wrote for the "conference of the Louisiana Supreme Court" (presumably the seven elected Justices) on January 23 (and the full text is Appendix D): "You are, of course, free to disagree with the conclusions of this court. Judges in Louisiana are not, however, free to disregard the rulings of the Louisiana Supreme Court on constitutional issues."[4]
The writer now reasserts that, ordered to this Court by the seven elected Justices as a "Justice pro tempore," and not as clerk, cook, yardman, or janitor, he now acts and writes as a Justice of the Louisiana Supreme Court, and is not subject to being told how or on what basis to act as a Justice. The ruling of this Louisiana Supreme Court is as much this Justice's as any other Justice's; insofar as these cases are concerned, this Justice (at least until supplanted on application for rehearing) is the Louisiana Supreme Court as much as any other Justice who heard these cases andif there be due process in Louisianahe is more so at this point than are the elected Justices who did not hear these cases.
"The fundamental requisite of due process of law is the opportunity to be heard," Grannis v. Ordeau, 1918, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363, "the right to be heard before being condemned to suffer grievous loss of any kind," Joint Anti-Facist R. Comm. v. McGrath, supra, 341 U.S. at 168, 71 S.Ct. at 646.
Although the Louisiana Supreme Court's interpretation of the Louisiana Constitution *1167 is ordinarily not reviewable by a federal court, Powell v. Alabama, 1932, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, the United States Supreme Court has many times reviewed a state supreme court's interpretation of state law that defeats a litigant's right under federal law. For example, Indiana v. Brand, 1938, 303 U.S. 95, 100, 58 S.Ct. 443, 446, 82 L.Ed. 685, reversed the Indiana Supreme Court's interpretation of that state's own teacher-tenure statute "in order that the constitutional mandate [against a `Law impairing the Obligation of Contracts,' U.S. Const. art. 1 § 10] may not become a dead letter." Similarly, Ward v. Board of County Com'rs, 1920, 253 U.S. 17, 22, 40 S.Ct. 419, 421, 64 L.Ed. 751, reversed an Oklahoma Supreme Court decision based on state law by which a federally-guaranteed right was denied, insisting that a federal right, although not denied in express terms, cannot be "denied in substance and effect, as by putting forward nonfederal grounds of decision that [are] without any fair or substantial support."
One may pretermit suspicions about whether other assigned Justices give the deliberation that is due to the cases on these unwelcome assignments, especially when the assigned Justices' votes are of no real weight in any event. (The writer is informed that all seven elected Justices, including the three who did not hear it, vote to decide whether a proposed opinion in one of these cases can be handed down. They alone vote on applications for rehearing.) There is no doubt in the case of this assigned Justice that he has not afforded a hearing on the merits in these cases because his view, as he long ago indicated to all elected Justices by letter, is that only the elected Justices can constitute the Louisiana Supreme Court.
The conclusion that emerges from all the circumstances is that Louisiana's Constitution's requirements, both for the constitution of the Supreme Court and for due process, have been violated in the elected Justices' plan of affording themselves "a degree of relief." Most important of all, the United States Constitution's requirement of due process has thereby been violated.
The deciding of criminal cases by seven elected Justices under a program in which three of them (perhaps three of a four-to-three majority) do not hear the accused is not merely a debasement of the three Court of Appeal judges "assigned" to sit with the other four elected Justices. It is simply not fair to the accused who was made to argue his or her case to that "Supreme Court." It is not the due process of law required by the Fourteenth Amendment to the United States Constitution.
This Court should declare itself unconstitutionally constituted and refer this case to the Louisiana Supreme Court as constituted by La.Const. art. 5, §§ 1, 3 and 4, which in law and in fact is the Court that alone can render judgment on the merits of this case.

APPENDIX A
MR. HENRY (Cont'd).
50 yeas and 63 nays and the amendments are rejected.
Mr. Gravel moves to reconsider the vote by which the amendments were rejected and lay the motion on the table.
Without objection, so ordered.
Are there further amendments to this section, Mr. Clerk?
Judge Dennis now moves the adoption of Section 4.
Is there any further discussion?
Are you ready for the question?
Without objection, the previous question is ordered.
Therefore when the machine is opened, as many of you as are in favor of the adoption of Section 4 will vote yes, those who are opposed will vote no.
The Clerk will open the machine.
Vote your machines, delegates.
Are you through voting?
The Clerk will close the machine.
103 yeas and 9 nays and the section stands adopted.
*1168 The gentleman now moves to reconsider the vote by which the section was adopted and to lay the motion on the table.
Without objection, so ordered.
Read the next section.
MR. POYNTER
Section 5. Supreme Court; Supervisory, original and appellate jurisdiction, Rule-making power, Assignment of judges.
Section 5. (A) The Supreme Court has general supervisory jurisdiction over all other courts. It may establish procedural and administrative rules not in conflict with law. It may assign a sitting or retired judge to any court.
(B) The Supreme Court has exclusive original jurisdiction of disciplinary proceedings against members of the bar.
(C) Except as otherwise provided in this constitution, the Supreme Court's jurisdiction in civil cases extends to both the law and the facts. In criminal matters, its appellate jurisdiction extends only to questions of law.
(D) In addition to appeals provided for elsewhere in this constitution the following cases shall be appealable to the Supreme Court:
(1) A case in which a law or ordinance has been declared unconstitutional.
(2) A criminal case in which the death penalty or imprisonment at hard labor may be imposed or in which a fine exceeding five hundred dollars or imprisonment exceeding six months has been actually imposed. In other criminal cases an accused shall have a right of appeal or review as provided by law or by rule of the Supreme Court not inconsistent therewith.
(E) Subject to the provisions of Subsection C, the Supreme Court has appellate jurisdiction over all issues involving any civil action properly before it.
MR. HENRY
The gentleman will explain the section.
MR. DENNIS
Mr. Chairman, fellow delegates, this section sets forth the powers and duties of the Supreme Court. This section represents no great change from the present constitutional provisions. Subparagraph (A) grants the Supreme Court general supervisory jurisdiction over all courts. This is no change in substance from the present law. It also grants the court the power to establish procedural and administrative rules not in conflict with law. This means that the Supreme Court may establish procedural or administrative rules but that they might be changed by the legislature if the legislature so desires. This is a clarification of the Supreme Court's present rule-making powers. It also specifically states that the legislature, by enacting a law in conflict with a rule adopted by the Supreme Court, could change it. The third sentence allowing the Supreme Court to assign a sitting or retired judge to any court is not a change in the law either. This power is granted the Supreme Court in the present constitution. Subparagraph (B) continues without change in substance the Supreme Court's exclusive original jurisdiction of disciplinary proceedings against members of the bar. This is traditional in our state and in almost all other states that the Supreme Court is the forum in which disbarment proceedings must be decided. Subparagraph (C) provides that the Supreme Court, except as otherwise provided in the constitution, in civil cases has jurisdiction to review both the law and the facts. This is a continuation of our present law which is based on the French civilian tradition of appellate review of the facts. In criminal matters however the appellate jurisdiction is restricted to questions of law. This also is the present law in our constitution and is continued without substance. Subparagraph (D) provides for cases which are appealable of right to the Supreme Court. The Supreme Court by virtue of its supervisory jurisdiction can hear any case that it chooses that arises in the Louisiana court system, however, Subparagraph (D) says that it must hear these kind of cases. It has no discretion. It must grant the appeal and hear the case described in Subparagraph (D) and that is two kinds of cases. First is a case in which a law or ordinance has been *1169 declared unconstitutional by a lower court. The second kind of case is a criminal case in which the death penalty or imprisonment at hard labor, which means the state penitentiary, may be imposed or a less serious criminal case in which a fine of five hundred dollars or imprisonment of six months has actually been imposed. In other criminal cases where the fine is under five hundred dollars or the sentence is under six months the article directs the Supreme Court to establish rules for review, either to the Supreme Court or to some other court in the court system, but also provides here again that the legislature may change those rules or make rules on its own for the appeal of these cases. These are largely misdemeanor cases we are talking about here. Paragraph (E) provides that the Supreme Court has appellate jurisdiction over all issues involved in any civil action properly before it. This simply means that once the Supreme Court grants a writ and agrees to review a case or once a case is appealed to it, that it may review all of the issues in that case. It may look at the case as a whole and review all of the issues, subject to the exception in Paragraph (C) where in criminal cases it can only review questions of law.
MR. HENRY
Would the gentleman yield to a question from Mr. Derbes.
MR. DERBES
Judge Dennis, just a technical question. On page 3, line 2, the term "civil action" seems foreign to our jurisdiction. It seems to me to be a matter of federal court.
MR. DENNIS
I am sorry. I'm not with you.
MR. DERBES
I say on page 3, line 2, from where does the term "civil action" derive?
MR. DENNIS
It was only intended to relate to non-criminal cases. It is synonymous with civil cases that we used earlier. It was not intended to create a new kind of action in Louisiana if that is what you are concerned about, Mr. Derbes. We simply used the word "action" instead of "cases."
MR. HENRY
Would you yield to a question from Mr. Duval?
The gentleman yields.
MR. DUVAL
Judge Dennis, I notice in your proposal you deleted reference to direct appeal to the Supreme Court from public service commission type rulings, election contests and I think under the present law, some civil service commission rulings are directly appealable from the district court to the Supreme Court. My question is, was it the intention of the committee that these appeals do not lie to the Supreme Court or should they be provided for elsewhere in the constitution.
MR. DENNIS
It was our intention that they should be provided for elsewhere. We understood that the executive department was debating whether to put the entire public service commission machinery in the constitution or not and if they did they would probably provide for judicial review in the same section. That is why in beginning Paragraph (D) we said in addition to appeals provided for elsewhere in this constitution. We don't intend to limit the mandatory appeals to these two types of cases.
MR. DUVAL
Thank you.
MR. HENRY
Do you yield to a question from Mr. Abraham?
The gentleman yields.
MR. ABRAHAM
Judge Dennis, in the present constitution it provides that the jurisdiction applies for suits for removal from office of the judges of courts of record and you have left that out in this particular section. I realize that over on page 10 the judiciary commission recommends to the Supreme Court this type of thing but leaving out the language here. Is the situation going to be covered by not specifying that the Supreme Court has jurisdiction over suits for removal from office of judges?
*1170 MR. DENNIS
Yes sir, we felt that it was adequately covered in Section 25 which establishes again the judiciary commission.
MR. ABRAHAM
Is there any other means by which though, other than the judiciary commission, that a suit might be brought to remove a judge from office?
MR. DENNIS
No sir. Judges could be impeached under the provisions of the legislative article that we have already adopted, but you will recall that suits against judges was not thought to be a proper vehicle, an adequate vehicle, in the legislative article and so it was left out there. We have two routes for removing judges though. We have the impeachment and the judiciary commission.
MR. HENRY
Do you yield to one more question from Mr. Anzalone?
The gentleman yields.
MR. ANZALONE
Judge Dennis, in line 12, "it may assign a sitting or retired judge to any court," I know that this does not represent a change in the law. My question to you, sir, is that in the debate by your committee, was any other possibility besides the reassignment of a sitting judge discussed?
MR. DENNIS
Would you clarify your question? Do you mean for what purpose, in order to equalize the work load or....
MR. ANZALONE
Judge, a little bit more specific, what I am talking about is that when we've got a sitting judge back home it is hard enough to get orders signed, but when the Supreme Court decides that they are going to take him away from us and give him to somebody else for six or seven months at a time, and then it makes it a little bit harder to get orders signed, that there are some people who just disagree with this policy. My question to you is did your committee consider the possibility of seeking interim appointments from other than sitting judges?
MR. DENNIS
We did consider the fact that it would be nice to have a pool of supernumerary judges. Some states have this. I don't know whether that's the proper word for it, but they have extra judges, so to speak, in a pool that can be drawn upon in cases of death, heart attacks, illness and so forth, but we didn't feel that our article would actually prevent the legislature from doing that if it thought it had enough money to do it. Just to answer your question, we did consider it briefly but felt like it was so embroiled in fiscal matters that we would leave this up to the legislature, that until the legislature acted we would continue to let the Supreme Court fill in the gap with assigning sitting or retired judges.
MR. ANZALONE
I know that you are chairman of this committee. Would you consider supporting an amendment which would remove sitting judges from your provision?
MR. DENNIS
Well, I would like to and I would if we had some extra judges, but we don't and I think we are going to have to rely upon our sitting judges to help one another out in their district...
MR. HENRY
Judge, you have exceeded your time, sir.
Mr. Conino offers up amendments.
The Clerk will read the amendments.
MR. POYNTER
Amendment No. 1 on page 2, line 11, after the period, delete the remainder of the line and delete lines 12 and 13 in their entirety and insert in lieu thereof the following: "It may assign a sitting or retired judge to any court with his consent and with the consent of a majority of the members of the court in which the judge is assigned."
MR. HENRY
The gentleman will explain the amendments.
*1171 MR. CONINO
Mr. Chairman, ladies and gentlemen of the delegation, fellow delegates, my amendment basically takes care of the administrative procedures which the local courts and the Supreme Court must abide by. Basically in the state of Louisiana the procedure for criminal and civil are set out in our statutes called the Code of Civil Procedure and the Code of Criminal Procedure. These are the state laws which our courts must abide by. If you will notice in the committee proposal it states supervisory jurisdiction. We feel that the supervisory jurisdiction given the Supreme Court is adequate enough and we can delete from that the second sentence which reads, "it may establish procedural and administrative rules not in conflict with law." Then we will tackle the other sentence a little later on. We feel that the local courts deserve the flexibility that they must have to administer their own problems that come within their jurisdiction. Presently existing rules of the Supreme Court give the Supreme Court adequate supervisory jurisdiction. Each district court, juvenile court, parish court, city court has different problems depending upon the area which it is in. It has finance problems, personnel problems and what have you. These are all local problems which should be dealt with at a local level. We do not feel that the Supreme Court should administer to the local courts and should tell the court how to operate the administrative part of its court. The committee proposal gives absolute and total power to the Supreme Court. The judicial administrator of the Supreme Court could become a Tsar and go down and snoop in the records of the local courts and thereby create problems on a local level. This Tsar could possibly supercede in many respects some of the local courts. We wish to give independence to the local courts to handle their administrative duties. They were elected on a local level, their obligations are statewide. However in many instances it belongs to the local people and their obligation is to the local people. So each district and local court presently establishes its own administrative duties. Each court has its own set of rules. If you practice in one district court and you go over to another district court, you can learn what those rules are in the other court. So recently a meeting of the district and court of appeals and several of the Supreme Court justices stated that they do not want this additional administrative duty. They prefer to leave this to the local courts and this is what we are doing in this amendment. The other part we are dealing with in this amendment is the transfer of a judge. In the committee proposal there is a mandatory transfer of the judge from one district, or one court, to the other. Our committee says that the sitting judge or retired judge may assign, and the court with the consent of that particular judge. It says the consent of the judge being transferred and also the consent of the district court where the judge is being transferred also would have to give its consent. You might have a local judge in the parish of Orleans or Jefferson who is compelled to serve in the northern part of the state. He does not wish to be transferred up there and that is what this particular amendment does. I urge your adoption of this amendment.
MR. HENRY
Do you yield to a question from Mr. Tobias?
The gentleman yields.
MR. TOBIAS
Mr. Conino, are you well aware of the fact that your proposal or your amendment would strike out the phrase "It may establish procedural and administrative rules not in conflict with law?"
MR. CONINO
That is correct.
MR. TOBIAS
In other words, you are gutting the right of the ability of the Louisiana Supreme Court to be the general supervisor of the entire judiciary system in the state.
MR. CONINO
No, Mr. Tobias, if you will refer to the first sentence, it says, "general supervisory jurisdiction," and we are leaving it there as *1172 it presently is. The only thing that we are removing is the day-to-day administrative details which ought to be left to the local and district courts, the juvenile courts and what have you.
MR. TOBIAS
I would suggest to you that by striking that sentence that this particular phrase "general supervisory jurisdiction" would be without any meaning whatsoever. Do you not agree?
MR. CONINO
No, I don't agree.
MR. HENRY
Do you yield to a question from Mr. Chatelain?
The gentleman yields.
MR. CHATELAIN
Mr. Conino, I would like a little information please on how old is he usually when a judge retires? How old is the judge usually?
MR. CONINO
How old is he? I think one of the proposals here says seventy years of age.
MR. CHATELAIN
Is this just a courtesy or a normal procedure.... how often does the retired judge come back into play, to be reassigned?
MR. CONINO
To be reassigned, a retired judge? Normally, as they are needed. He is transferred from one district to another.
MR. CHATELAIN
Is that procedure followed pretty much? Is it pretty often done?
MR. CONINO
Yes, it is used quite frequently.
MR. CHATELAIN
You think that it's necessary to put that in the constitution?
MR. CONINO
Not necessarily, no, but since...
MR. HENRY
Does the gentleman yield to a question from Mrs. Brien?
The gentleman yields.
MRS. BRIEN
Mr. Conino, would your amendment take away the extra power given to the Supreme Court in the original proposal?
MR. CONINO
Do you mean the administrative powers?
MRS. BRIEN
Yes, by writing out that one sentence, doesn't it reduce the power again to the Supreme Court and put it back like it was?
MR. CONINO
That's right. It would reduce the Supreme Court's powers as far as the administration of the local courts.
MR. HENRY
Does that complete your remarks, Mr. Conino?
Justice Tate.
MR. TATE
Mr. Chairman and fellow delegates, I rise in opposition to the amendment and in favor of the committee report. One word in explanation of the second sentence which was deleted, which says, "it may establish procedural and administrative rules not in conflict with law." This was added at the suggestion of Chief Justice Sanders. In the view of myself, him and almost anybody who has studied the matter, it adds nothing and detracts nothing from our present powers. It clarifies the fact that our procedural and administrative rules are subject to the legislature. I don't think really, if anybody thinks about it, that is controversial. I rise particularly in opposition to the requirement that we may assign sitting judges, only with the consent of that judge and of the court itself. The responsibility of the Supreme Court to help administer an efficient statewide system extends to the possibility that there may be no judge in a given district and it is necessary to ask a sitting judge to serve there. As a matter of fact no judge has been asked to serve unless he consented to it, as a matter of fact. However, if, for instance, you had an ugly case up in East and West Feliciana where Judge Bill Bennett is (he was back there a *1173 minute ago) and nobody wanted to go, I think certainly the interests of the people of the state demand that a judge in a district which is not busy should accept the assignment and go and serve the people of the state because otherwise the system as a whole ... there is no way to get a judge to decide a case in a district where somebody is recused, sick or something else. Now, we have to look at the administration of the state judicial system as an entity. The Supreme Court has never and would never in my opinion, and you have got to trust somebody, would never take a judge from an overbusy district and send him somewhere else. The power is when there is a judge whose docket is more than under control, possibly because some districts have a very, very low case load, that there should be that available manpower to serve over in another district. Now for instance, the judges in the district over there have to consent to the assignment. Now in many cases there is no more than one judge, one sick judge. I personally don't think that the mechanics should require, for example, if in Orleans one of the ten judges in the civil district court, or one of the ten or eleven judges of the criminal district court, needed temporary help, I personally don't think that it is feasible, wise administration or anything else, to require the Supreme Court both to find a judge willing to serve, although they always do, then submit him to a meeting over there where they vote on whether or not to accept him. It is cumbersome enough as it is to find judges to go serve. We are short of judges over the state. Thank goodness we have a few retired judges in good health, two or three, who have been able to plug in when we needed them. We have one, my good friend from Jefferson who sponsored this amendment, Judge Bel. I haven't heard any complaint from this very fine judge. I'm sure you all would have accepted him. Incidentally you have a very good judicial system in Jefferson. Your judges are up on their work and there is no problem there. But there are problems in other places where the judges are falling behind, where you need people to come in to help. For instance, in Orleans Parish in 1954 the criminal district court was way behind. The Supreme Court was able to send in Judge Fruge and I believe Judge Holcomb to help there and they sat with those judges as extra divisions and helped them clean up the docket. That is the sort of thing that you just have to be able to do, when the people demand the statewide system operate efficiently for all of the people. As a judge, I am a servant of all of the people, not just in my district. A judge who is elected from a given district, his primary responsibility is to the law, his secondary responsibility might be to the people of the district, but certainly he also has a responsibility to the people of the entire state and to help the judicial system serve the people efficiently. Mr. Chairman, that's all. I yield to any questions.
MR. HENRY
Do you yield to a question from Mr. Flory?
I'm sorry, Mr. Tapper. You will be next. I didn't see you.
MR. FLORY
Judge Tate, along the lines of assigning judges, isn't it possible under the proposed section that the Supreme Court could assign a judge that had been defeated, a judge that had chosen not to run because he couldn't be elected, or a judge that had retired at twelve years? Now, if that is possible, isn't this subverting the will of the people in creating new judgeships to take care of workloads where they are peaked and it can be justified, which in that case the people would have the right to choose their own judge?
MR. TATE
Mr. Flory, the assignment power is used in temporary situations. Now it is true, and I suspect this opposition in Jefferson comes from the fact that when a certain criminal district judge in Orleans had been defeated (who many people think, despite his rough ways, is one of the finest minds in criminal law the judiciary produced) he was assigned to help Jefferson and Jefferson didn't like it, and the Supreme Court has *1174 the policy now that it will not assign a defeated judge to a place even on a temporary basis without being sure it is acceptable. However, I don't think you should tie the hands of the court or the people to permit temporary assignment without the expense of creating a permanent new position, when it is only a temporary situation needing temporary help, or a sick judge for instance.
MR. FLORY
I am not familiar thoroughly with the Jefferson situation but you have got a lot of judges who have been assigned that have been retired for years and are still sitting and there is no way you can rid of them?
MR. TATE
If you are talking about a situation in Baton Rouge, there is a judge over seventy-five who at the unanimous request of the judges of Baton Rouge and the consent of the Baton Rouge Bar was asked to come over here and serve as motion judge to handle confirmations of defaults and noncontroversial matters to free the full-time judges from that detail so they could try more cases. The Baton Rouge district, incidentally, is one of the most efficient...
MR. HENRY
Judge, you have exceeded your time, sir.
Mr. Schmitt.
Mr. Tapper, I'm sorry. Judge Tate just talks so much when he gets started there is not much I can do about it.
MR. SCHMITT
I am in favor of this amendment and I would like to give you my main reasons for being in favor of it. I had the unpleasant experience of being an attorney in a court of law in Orleans Parish when we had one of these retired judges sitting. This was an elderly man and I didn't hold that against him but apparently he was from a different part of the state and he had a different philosophy than we had in Orleans Parish. In his part of the state apparently police told no lies, so when he made his decision from the stand, and he stated it from the stand, that he would believe the policeman's word. He gave them greater credibility than any other judge in our court system would have given them. In Orleans Parish generally the police feel that the district attorney's office is going to be involved in plea-bargaining in different types of cases. Therefore what they do is they charge the man with the highest possible offense. As an example if you get involved with a fight with someone the police might charge you with attempted murder, knowing that the district attorney's office is going to reduce this to aggravated battery or simple battery or some other related offense. But when these same cases were brought before this judge and he saw that the district attorney's office brought these charges forward, he felt in his heart that these people must have been guilty. As a result of that many people were found guilty. I don't know whether or not they had committed the crimes, but his philosophy differed to such an extent that probably a lot of innocent people were found guilty in these cases. His concept of a person being guilty and not guilty was different from any other one I had heard in the state of Louisiana. I actually saw him go off the record, which is also unheard of. He said, "I do not want this made part of the record", the court reporter stopped making it a part of the record, then he proceeded to tell this black man why he was not guilty. After doing this he said "are you ready," and the man went up and talked to the judge and talked to the district attorney so he pled guilty. I'm sorry, he never pled guilty, but he was ready for his sentencing. The judge turned around and found him guilty. The attorney went to object, saying, "but you just said that this man couldn't be found guilty." He almost held the man in contempt of court. Going on and off the record is something which to me is unheard of because of the fact than when you go up on appeal the only thing that the judges on appeal will see will be this written record. They are not going to see this other action which took place in the courtroom and was not made part of the record. When objections, or in criminal matters what are known as exceptions, were raised in these proceedings, *1175 this judge considered it as a personal insult and he often threatened attorneys to put them in contempt of court because they objected to his rulings. He cursed me out personally and he did many other things from the bench which horrified me as being a representative of defendants. Now who was the victim under the present system that we have right now. Were the criminals the victims? I daresay that if any one of those people who were found guilty under that judge had filed a writ of habeas corpus and had that brought before a court of appeals or the Supreme Court, they would have been let loose because of this judge's antics and tactics on the bench. The people are the victims, you and I, the innocent people. Many guilty people could possibly have gone free. This man also had another philosophy. He believed that prostitution was a wonderful way of life and that it was o. k. because of the fact that it kept people off the welfare roles. These are just some of the instances of things that just shocked me because I just didn't think people existed in the twentieth century which had the concepts that this man had. I went and complained to some of the justices and they had felt the same way and they had stated that some of the judges from Orleans had complained about this man and many attorneys had complained about him, yet that judge still sat on that bench. I favor this amendment because I feel that it will help prevent such abuses of the civil process and the criminal process in the future.
MR. HENRY
Wait just a minute, Mr. Schmitt. Mr. Schmitt, please.
Why do you rise, Mr. Stovall?
MR. STOVALL
Are we dealing with the characteristics of a particular judge who is assigned to a court or the general matter that is covered in this amendment?
MR. HENRY
Well, Reverend Stovall, we have allowed a great deal of latitude and your point might be well taken. The gentleman has exceeded his time anyway, so it is of no importance.
Mr. Derbes.
MR. DERBES
Ladies and gentlemen, if I can get your attention for a couple of minutes, I would like to tell you why I am opposed to this amendment. Mr. Schmitt is an example of the old legal maxim that "a judge is a good judge when he agrees with you and a bad judge when he disagrees with you". Unfortunately, the example here is, in my opinion, not the real question at hand. The real question at hand is whether or not we are to have some centralized authority to supervise our judicial system or will our judicial system be fragmented into a series of minor fiefdoms where one judge perhaps is not one to accede to certain demands or necessities in another section of court. What I am referring to is the old rule of judicial abstension. I am using the term loosely to refer to what I regard as the basic policy on the part of most judges not to take cases when other sections of court have matters pending in them, not to get involved in anything that is not ordinarily allotted to them. The principle operates unfortunately to the detriment of a policy of centralized management. That is, if the demands of one particular court require that additional personnel be assigned to that court then in order to better serve the interests of justice and the public, that assignment in my view should occur. The question is, do you leave that assignment solely to the discretion of the individual judge and to the individual... various members of the bench to which the assignment will occur. I believe that if you leave that final decision to them alone and provide no alternate authority in any supervisory body that you may unfortunately encounter the instance where in my opinion the most efficient allocation of judicial resources will not occur. So, I briefly urge you to defeat the amendment and to preserve in the Louisiana Supreme Court the ultimate authority for adoptions of standards and rules of procedure and for ultimately the final say-so in what additional judicial personnel should be assigned *1176 where needed to any given court. Thank you.
MR. HENRY
Mr. Wall. Mr. Wall apparently passes.
Judge Dennis.
MR. DENNIS
Mr. Chairman, first if I am in order, I would like to move for a division of the question on this amendment. The amendment as I see it....
MR. HENRY
The question is not divisible, Judge Dennis.
MR. DENNIS
Well then, Mr. Chairman and fellow delegates, I must oppose the entire amendment because this amendment does two things. First of all, it takes out the sentence which grants the Supreme Court the ability to establish procedural and administrative rules not in conflict with law of the legislature.
And the second part of it deals with assigning sitting judges. I think that both sentences, both parts of the amendment, will detract from the Supreme Court's ability to administer the system. But the first sentence is fatal because if it is taken out, this would mean that every district judge like myself can establish his own little fiefdom and run his court the way he wants to, take as much time to decide his cases as he wants to. And I don't believe this is what our people want. Our people want, I believe, speedy justice, fair justice and they want it consistent throughout the state. And the only way we are going to get that is to give the Supreme Court the authority to establish some reasonable rules about how long a judge can take to decide a case and about a judge helping other districts out when they get in trouble.
So, ladies and gentlemen, I must ask you to defeat the entire amendment.
MR. HENRY
Would the gentleman yield to a question from Mr. Lanier?
The gentleman yields.
MR. LANIER
Judge Dennis, this language that it may establish procedural and administrative rules not in conflict with law, is this intended to mean that the Supreme Court could make the local court rules of each judicial district?
MR. DENNIS
No, sir, it's not. The way this language came about in the committee, the present Constitution says that the Supreme Court has control of and general supervisory jurisdiction over all courts. Some of the members of the committee objected to the words, "control of," and they were taken out. Now just to be sure that that didn't completely take away the Supreme Court's right to make reasonable rules as to the administration of justice in the state about things such as how long you can take to decide a case and reporting to the Supreme Court about case loads and things of this nature which are essential to efficient management of the entire court system. Just to make sure those were not done away with by deleting the words, "control of," we put in the second sentence which clearly states that the Supreme Court can make procedural, administrative rules.
MR. LANIER
So, what we have here, this does not authorize the Supreme Court to tell each judicial district how to make its local court rules. It merely is to give the court authority to control the general administration of justice throughout the whole system.
MR. DENNIS
That's correct, Mr. Lanier, and I believe that under this even if something like that should be attempted, the legislature could, by its authority in this sentence, come in and write another rule and say you can't make local court rules. But it is not the intention of the....to grant the Supreme Court that much pervasive power.
MR. HENRY
Would you yield to a question from Mr. Bergeron?
Mr. Roy.
The gentleman yields.
*1177 MR. ROY
Judge Dennis, what this provision would do, the second sentence of Section 5, is to mandate district judges to decide their cases in a sense. And if a district judge decides he is not going to decide his cases, the Supreme Court would have the authority to make him do so. Isn't that correct? It would prevent judges from sitting on cases for two and three years and not deciding them. Isn't that what it allows the Supreme Court to do?
MR. DENNIS
Yes, sir. That's the kind of power that I think is legitimate and good and directed for....to bring about justice throughout the state. I think that's needed.
MR. ROY
I agree. And if we adopt this amendment, it takes away that particular power, doesn't it?
MR. DENNIS
You're right, Mr. Roy.
MR. ROY
So that you could have some district judges sitting on his haunches for six or seven years even and not deciding a case, couldn't he.
MR. DENNIS
I think it might, as I said, set up little fiefdoms. Each judge would run his court the way he wanted to.
MR. ROY
And wasn't that a problem in the past until the Supreme Court started getting the judicial administrator to get on some of these judges. And isn't it still a problem with some district judges.
MR. DENNIS
As I said earlier, I think this is one of the biggest complaints that the public has about the court system throughout the country.
MR. HENRY
Would you yield to a question from Mr. Stinson? This will wind it up.
MR. STINSON
Judge Dennis, if they want to get action instead of letting a man sit....someone take over and do his work, why don't they just....why didn't you provide they would hold up his salary, I'll bet you'd get some action, wouldn't you?
What are you going to do, give the judge a vacation and send a man in to do his work and pay him a paid vacation?
MR. DENNIS
Well I believe that could be provided for by a rule, too, possibly. I believe we have a statute to that effect now but it's rarely used because it requires that an attorney must initiate, and attorneys are reluctant to initiate these things against judges. That's why the authority should be in the Supreme Court, not....you shouldn't leave it up to individual attorneys to have the courage to attack a judge to get something done.
MR. HENRY
Gentleman, you have exceeded your time.
Are you ready for the question?
Without object, previous question is ordered.
You have the right to close, Mr. Conino, you waive?
Mr. Conino passes.
The gentleman has offered up amendments to which objection has been urged.
Mr. Wall requests a record vote. Will twenty-six delegates join him? .... And a record vote is ordered.
Therefore, when the machine is opened, as many of you as are in favor of adoption of the amendment will vote yes, those opposed will vote no, and the Clerk will open the machines.
Vote your machines, delegates.
Please vote your machines.
Are you through voting?
The Clerk will close the machine.
21 yeas and 93 nays and the amendments stand rejected.
Judge Dennis now moves to reconsider the vote by which the amendments were rejected and lay the motion on the table.
*1178 Without objection, so ordered.
Mr. Clerk, we have other amendments.....what about Section B. Are there any amendments on Subsection B?
There are? Who offers them?
We have amendments to B, Mr. Clerk?
There are no amendments to B, then the next proposition is to C. Is that correct?
Do we have amendments to C, Mr. Clerk? We have amendments, Mr. Clerk?
MR. POYNTER
Delegate Roy has amendments.
MR. HENRY
Read them, Mr. Clerk.
Mr. Roy, you have a problem in your amendment. I think Mr. Clerk you had better explain it to him.
MR. POYNTER
The amendment as drafted reads: "on page 2, line 17, after the word, `civil', delete the remainder of the line and on line 18, delete `both the law and the facts' and insert in lieu, thereof, `and criminal cases extends only to questions of law'".
That would make the paragraph read, "except as otherwise provided in this constitution, the Supreme Court's jurisdiction in civil and criminal cases extends only to questions of law", but leaves the last sentence, "in criminal matters its appellate jurisdiction extends to only questions of law".
MR. HENRY
You didn't want that that way, did you?
MR. POYNTER
You didn't want that redundancy .... make a slight change, then, Mr. Roy, page 2, line 17 after the word "civil" delete the remainder of the line and delete lines 18 and 19 in their entirety and insert in lieu thereof the following: "and criminal cases extends only to questions of law".
MR. HENRY
Would the gentleman explain the amendment?
MR. ROY
Mr. Chairman, ladies and gentlemen of the convention, there are some other co-sponsors on here. Senator De Blieux asked to be a co-sponsor and Delegate Guarisco and a few others.
Let me tell you what I'm doing here and what we are trying to do and to meet the issue head-on.
Presently, the law of this state is that the Supreme Court may review only errors of law in cases going before it of a criminal nature. However, in civil type cases, that is those that don't deal with anybody going to jail or being fined, the Supreme Court may review questions of fact. Now what does this mean for the ordinary layman?
It means that if you are convicted of a crime and they question a fact as to whether there was enough evidence to convict you or not, the Supreme Court may not review that conviction unless there was a technical error of law committed in the trial of the case. And if so, then he may grant you a leave.
But if the Supreme Court, even if it was satisfied, a majority of the Court, that there was not enough evidence to convict you, it could not reverse the conviction because the Supreme Court may only review errors of law in criminal cases. Mind you, we are talking about a man's life or liberty.... not being able to be reviewed by the Supreme Court on fact matters.
However, if, after a trial on the merits a district judge or jury finds as a matter of fact in a case that you are entitled to so much money for the loss of an arm and that your particular case you should get so much money, since that is a civil case, when it gets up to the Supreme Court, it may review the questions of fact and if the majority of the Supreme Court decides that your arm is not worth what the jury or judge thought it was worth, it may reduce it or it may, in certain cases reverse the whole award to you.
Now I don't understand the logic there. I have never understood the logic of an appellate court being able to review questions of fact but not .... in civil cases but not in criminal cases. In fact, I don't think it belongs at all in either case. The U. S. *1179 Constitution by the seventh amendment provides that the appellate courts may not review findings of fact by the district, or judges or juries and there is a good reason for it. You hear or see me talking right now. You make an opinion or a judgment about the way I am conducting myself. I may make a facetious comment about something that you may interpret it as just that, a facetious comment.
But if you read the newspaper tomorrow and you haven't been here today and somebody has then got to determine what manner of speech I used in making the comment, he may get confused. And that's exactly what happens in a lot of cases on appeal. Because you know on appeal the only thing that goes up is a record. And the judges in the court of appeal read this record and they try to decide and second guess the district judge or jury as to how the witnesses presented themselves; were they telling the truth or not? Was their demeanor good? These are only things that the person at the district court level can appreciate whether he be judge or jury.
What I am trying to do by this is to say that in questions of fact, the Supreme Court may not tamper with the local judges' ruling or the local juries' ruling.
Now it may, on a question of law, always review. And it may reverse. But when it comes to a fact matter, it is not allowed to do so. I think it's a good amendment. I think we need to meet that issue head on.
Louisiana, incidentally, is one of the few states in the union that allow the appellate courts to review questions of fact. The Federal System in this state does not allow the review of fact questions. That's why I said earlier that a Louisianian has to try to put on a federal cap a lot of times to get what he thinks should be the best justice.
If he can put on a federal cap and get in the federal court and a decision is rendered in his favor on a question of fact, the Fifth Circuit will not touch it.
But even if, after a trial on the merits, a jury of twelve men comes back and says, "We believe Mr. Roy's client," or, "We don't believe Mr. Roy's client," when it goes up on appeal, some judge reading a court record can say, "Well, five witnesses said the light was red, four said it was green, so we can reverse what the people who heard the witnesses say believe." I don't think it's right. And that's all this amendment does, it restricts the appellate review of the Supreme Court to questions of law alone.
MR. HENRY
Would you yield to a question from Mr. Lanier?
MR. ROY
Yes, sir.
MR. HENRY
Gentleman yields.
You are next, Mr. Derbes.
MR. LANIER
Mr. Roy, do you believe that juries are able to make mistakes on questions of facts?
MR. ROY
Yes, but I believe that appellate courts reading a court record make a lot more mistakes than juries do.
MR. LANIER
Do you believe that a trial judge in a district court can make an error on facts?
MR. ROY
Yes, I believe that, too, but I believe that an appellate judge reading a cold record, not having heard or seen the witnesses, not having seen the testimony presented makes a lot more mistakes than that judge does.
MR. LANIER
Do you believe that justice is done when an error on facts is perpetuated in an appellate record?
MR. ROY
No, I don't believe that. But I believe that more miscarriages of justice occur when appellate judges take into their own hands their own interpretation of facts when they've not heard or seen the witnesses and reverse juries and judges who have rendered correct judgments.
*1180 MR. HENRY
Would you yield to a question from Mr. Derbes?
Gentleman yields.
MR. DERBES
Mr. Roy, it would seem appropriate to me to try to indicate to this convention what effect this will have on the ordinary civil dockets in the courts throughout the state.
Isn't it correct that so long as the Supreme Court has no ultimate power to review facts, that there would of consequence be a substantial increase in the number of jury trials?
MR. ROY
No, I don't believe that, and I'll you tell another thing I don't believe. I think that if the appellate courts cannot review facts, you'd have fewer appeals and cases would be decided by the district court or jury and finalized at that level instead of the defendant or the aggrieved party or somebody not liking the verdict trying to get two bites at the apple.
MR. DERBES
So you answer my basic question in the negative?
MR. ROY
That's correct. Louisiana has had jury trials now for years and there's just not a great influx. That is a false issue .... the notion of an increase in the number of cases litigated.
MR. DERBES
It's not a matter of the increase in the number of cases litigated, Mr. Roy, it's an increase in the number of jury trials.
MR. ROY
That doesn't necessary follow because the judge .... the court of appeal or Supreme Court cannot review the judge's opinion as well as the jury's. So that doesn't bother that jury trial issue.
In fact, let me just point out in other states, in the common law states where you have jury trials that are prevalent, the defendant asked for jury trials in most of the cases. You try filing a suit in another state and ask the judge to decide it. Most of the times the defendants come in and ask for a jury trial himself.
But that's not the issue. The issue is not whether we can increase....
Do you have a question Mr. Sandoz? I'll stop.
MR. HENRY
Would you yield to a question from Mr. Sandoz?
The gentleman yields.
MR. SANDOZ
Mr. Roy, don't you agree that in other states that permits no review of fact by the appellate court, that there is a substantial backlog in their cases where in some states three, four and five years in getting a case to trial?
MR. ROY
I don't think that that's the reason for that, Mr. Sandoz. In your Northeastern states where there has been an influx of cases it has just been that way for many years because they don't provide for an adequate judiciary.
We have a great judicial system here. We've got enough judges, they don't provide enough.
MR. SANDOZ
But, don't you think, Mr. Roy, that the reason we have a great judicial system is the fact that we have this review of facts?
MR. ROY
No, in fact it works just the opposite. The fact that an appellate court in this state may take a second bite at the apple causes more appeals to be taken because either party who's aggrieved or figures he's lost decides to appeal. So it just continues the case on up through the appellate structure when it need not be appealed.
MR. SANDOZ
Mr. Roy, what about the cost of the parish government by encouraging jury trials in every little case. We don't have the system in the federal courts where we've got a minimum of ten thousand dollars on a case. In other words, you can ask for jury *1181 trials on five hundred dollar and thousand dollar cases which would cost [.....], which would cost your parish governments untold thousands of dollars.
MR. ROY
There's nothing in this Section that deals with jury trials at all, and you all are making a false issue of them. As a matter of fact to ask for a jury trial in Louisiana under present Louisiana law you have to have a minimum of a thousand dollars. So that's a... just don't be misled by all this jury trial conversation, ladies and gentlemen. It's not the issue.
The issue is simply whether you believe an appellate judge, reading a cold record, is in a better position to determine the veracity of a witness and his demeanor and his conscientiousness as the judge or jury who saw that person testify.
MR. HENRY
Would the gentleman yield to a question from Mr. Stinson?
The gentleman yields.
MR. STINSON
Mr. Roy, don't you think that if a district judge knows that he can do no error, no one's going to review him, that it's likely to make him play politics more in his decision than if he realizes that his decision would be reviewed by the higher court?
MR. ROY
No, I don't believe that. Maybe some would do it, but the fact of the matter is, that you are still trying to argue the substitute, some person's reading of a cold record for that of a district judge. And let's talk about the cases where the district judge is correct....
MR. HENRY
Mr. Roy, you have exceeded your time, sir.
Mr. Burson.
MR. BURSON
Mr. Chairman, ladies and gentlemen of the convention, I rise in opposition to this amendment. Now this amendment is a favorite project of an association of which I am a member, The Trial Lawyers Association. And as most of the members of that association in my legal career, I have primarily represented injured persons, whether in workmen's compensation cases or personal injury cases.
However, I disagree with the position taken by my fellow members of the association who seem to assume that denying appellate review of facts would redound always to the benefit of the injured party or the workmen's compensation claimant.
I have not found this to be the case in my experience as a trial lawyer in eight years of practice. I have rather found that on many occasions I was very happy to have recourse to appellate review of facts and I have participated in cases where I am convinced that the power of the appellate court to review facts in a personal injury or a compensation case has presented, has prevented, rather, great injustice.
Now our courts have used this power to appellate review of facts with discretion. We have what is called the manifest error rule which simply stated means that an appellate court will not reverse a trial court on a question of fact unless there is what is called manifest error, or error apparent on the face of the record. In my experience, it is very seldom that you will find an appellate court in the State of Louisiana reversing a trial court on a question of fact. They will say time and time again that the finding of the trial court on the question of fact is entitled to great weight.
My position on this issue would be that this system has worked well in what a judicial system is after all supposed to do, that is justice for all the parties, and that includes both the parties I represent and those I don't represent because the object of the judicial system is certainly not to favor those classes of persons that I happen, as a lawyer, to represent.
Now it has been pointed out that in federal court that the courts, there, of appeal do not have the power to review facts. I have found this to be a disadvantage in appellate review in federal court. To give you one easy example, I had a jury case, *1182 recently, where the personal injury awards were monstrously low in relation to the injuries involved. But I was not able to obtain appellate review of the findings with regard to injuries because it was a factual finding.
Only in a limited case where no damages at all were found for pain and suffering was I able to get a review. I am convinced that this same case in state court, I could have got justice for the parties involved.
I would agree, definitely with the tenor of the question by Mr. Sandoz that taking away the power of appellate courts to review facts will increase your backlog many fold. You have only to look at the examples of the States of Illinois, New York, California and so on where they do not have appellate review of facts, and they have backlogs of four or five years because everybody wants a jury trial.
I submit to you that our system has worked well and that my own personal experience would indicate to me that the greatest protection for an individual against a hometown decision or any other miscarriage of justice is to permit that appellate court to review that cold record that Mr. Roy was talking about where the appellate court does not have its emotions involved and I feel that justice will be more readily done.
If I've not exhausted my time I'll answer any questions....
MR. HENRY
You have time for about one question.
Mr. Avant. All right, sir. I don't believe there are any questions to answer.
Senator De Blieux.
MR. De BLIEUX
Mr. Chairman and ladies and gentlemen, I support this amendment. At the present time in our law, we have a double standard. We have a standard that involves money or property. You can get an appeal on the facts and the law. If it involves your personal rights as charged in a crime, regardless of what mistakes that may be made in evaluation of the evidence below, it can only be corrected if there is an error in law. That's not right. We should have one standard. If we are going to use it, it should be the same in criminal cases as in civil cases. There is no reason to have a double standard in our law.
And I say if you are not going to review the facts in criminal cases, why should you have the right to review the facts in civil cases? It is just as simple as that.
In contrary to the arguments that have been used here, I do not see where the appellate judges are any better able to decide whether or not a witness is telling the truth or not telling the truth, looking at a cold record than they can as a judge or a jury, listening to that witness in his own manner, his own mannerisms, his own voice, his own reflections tell his story.
If they can review it in a civil case, they ought to be able to review it in a criminal case. And if they can't do it in a criminal case, they ought not to be able to do it in a civil case.
I think this is a good amendment and I ask you to support it because I think it will eliminate the double standard and give us a whole lot more security and we'd have better facts decided by the lower court than we have at the present time.
I ask your support.
MR. HENRY
Mr. Derbes.
MR. DERBES
Mr. Chairman and fellow delegates, I think it might be helpful at this point to request or suggest the absence of a quorum.
MR. HENRY
Your point is certainly well taken.
The gentleman suggests the absence of a quorum. The Clerk will open the machine for roll call.
Vote your machines delegates.
Are you through voting?
The Clerk will close the machine.
110 delegates present and a quorum.
Proceed Mr. Derbes, you have four minutes left.
*1183 MR. DERBES
Thank you, Mr. Chairman, I'll be brief.
I rise in opposition to the amendment for primarily reasons of efficiency and the speed with which I believe justice should be granted. There is an old legal axiom that justice delayed is justice denied.
I personally feel that if this particular amendment were adopted that jury trials would become the rule rather than the exception and would slow down the machinery of justice perhaps even to the point where additional sections of court would be required to do the job now performed by those sections in existence in your areas.
I think there is one important consideration to bear in mind, and that is that we have, this conversation has adopted the principle of elected judges. That, to me, means that the judge is responsible to the people.
If this provision, if this amendment were suggested as a compliment to an appointment system for the judiciary, I think I might be in favor of it because it would insulate the people, the actual petitioners and claimants, from manifest errors by interposing a jury where appointed judges may, in my opinion, occasionally render judgments more in keeping with certain preconceived social notions.
For example, if the judiciary were selected by the Bar Association and were oriented toward insurance companies rather than plaintiffs, this, I believe, would be a good provision.
To the contrary, we have not seen fit to establish an appointment system for the judiciary. Rather, we have chosen an elected mechanism for selection of judges and in my opinion that creates a substantial responsibility and likelihood that the judges will follow the will of the people and will in my opinion, render judgments for the individual rather than for the firm or the company where permitted by law.
So I urge you in the interest of providing speedy trials, and in the interest of dispensing justice swiftly and efficiently, that this amendment be defeated.
Thank you.
MR. HENRY
Mr.... Justice Tate.
MR. TATE
Mr. Chairman and fellow delegates, I hesitate to trespass once more on your time, but at the request of a few I rise in opposition to Mr. Roy's amendment. Mr. Roy's amendment has a lot of emotional appeal. The reason I am against it is I think could be summarized for three reasons:
One. Under the present review in civil matters, the review of both law and facts puts on the clerk the duty of reviewing for justice in the truth of the matter. As a matter of fact, a properly replied .... the manifest error doctrine prevents the appellate court from disturbing evaluations of credibility and overturning factual findings on the mere whim of the appellate court. But the ultimate aim when you review for presence of fact, is fairness truth and the just result according to law. Now if our review is limited to questions of law as it is in criminal cases, the sole matter before the court is this technicality or that technicality. This rule of evidence, this instruction to the jury, this procedural step being put instead of that procedural step first, and what can the court do if it finds an error? It can do nothing more.... I'll answer the question .... than remand for retrial like in criminal cases. The Louisiana philosophy since 1812 has been in accordance with review of facts and law, and one trial wherever possible, and one appeal in civil cases to end the matter forever.
Now, when your review is limited to questions of law, what does a trial lawyer do? Naturally, he tries to raise, and I don't blame him, just as many technical traps as he can for the trial court. Why? In order to .... in case he loses, preserve some ground to have another shot at the apple on a retrial. So what happens? Instead of a case being tried in one day, it'll be three days. And instead of being finally over.... if there are some technical errors there, it's sent back and it occupies the trial judge again three days.
*1184 Now, I respectfully submit to you that the custom, tradition and law of this state since 1812 requiring appellate courts to review facts in law in civil cases has worked well. I would say that probably ninety-eight percent of the cases, the trial judge and jury and appellate judge are going to reach the same results. Two percent .... may differ. And those two percent, maybe they should differ.
But by and large the end result is one fast trial, one faster trial with full day in court. One appeal directed not to technicalities but to the merits. Who should win? And then the final conclusion of the matter. As a result, I may say, the Institute of Judicial Administration which collects statistics on delay in Metropolitan and other areas doesn't even list our state because as bad as we think the delays are, they are nominal compared to other states. Chicago five years to wait for a trial in an automobile accident case. New York the same and so on.
So I respectfully suggest that we should reject the Roy amendment as much as I like the author and appreciate his willingness for me to serve in perpetuity except limited to ten years.
MR. HENRY
Would you yield to a question from Ms. Zervigon.
MR. TATE
It's a pleasure, Ms. Zervigon.
MS. ZERVIGON
Judge Tate, you were on this committee. Did you all consider extending review of the facts to criminal cases?
MR. TATE
That is another question. I don't think we seriously did. I think someone proposed it. I don't think it carried with a second. But that's another question. I understand there is another amendment coming up on it.
MS. ZERVIGON
Do you have any idea why serious consideration wasn't given to review the facts on criminal cases?
MR. TATE
Well, that requires an awful long answer. The reason possibly is, tradition, the fact that we inherited that law from the Anglo-Saxon which traditionally limits review in criminal cases to law. The fact that as a matter of administration of justice, many times people were afraid that, for instance, an appeal on facts in criminal cases might involve, although I don't think it would, the district attorney being able to appeal, the question of acquittal and things like that. I'm not giving you a completely square answer because it's very complicated the question you asked why there shouldn't be a review of facts in criminal cases. But for the administration of criminal justice, it's generally felt that .... that has just not been extended.
MR. HENRY
Would you yield to a question from Mr. Perez?
The gentleman yields.
MR. PEREZ
Judge, isn't it a fact that one of the reasons that you do not review the facts in criminal cases because a criminal case is always tried before a jury whereas most civil cases are tried before a judge without a jury.
MR. TATE
That is a very good partial answer.
Of course I think in misdemeanor cases, we only review law. But in the vast majority of cases that is true.
MR. HENRY
Thank you Judge Tate.
Mr. Wall. Judge Wall. Do you pass?
Mr. Guarisco.
MR. GUARISCO
Mr. Chairman, members of the convention, I rise in support of the Roy amendment. Here we go again. Louisiana is bringing up the rear. The federal system doesn't do this, the other forty-nine states do not review the facts. In fact, no jurisdiction in the Western world reviews the facts, not even France from whence we *1185 supposedly get our civil code. It's unheard of in South America. Nobody reviews the facts on appeal except Louisiana.
Now is it because our district judges are stupid? Is it because our juries are uninformed and not able to listen to a factual situation and make a determination? I don't think we are unique there.
What happens is that someone makes what I call, you've heard of hearsay testimony? Well, this is what I call seesay testimony, in that, a judge reading a cold record as Mr. Roy said, is able to reverse the factual findings of a judge who saw the witness, heard the reflection in his voice, witnessed his demeanor and his whole attitude.
Or if they are better, in a better position to determine whether or not a person is telling the truth. For an example, and we see this in the press all the time. A man makes a statement and the press repeats his statement. The press is correct, but they didn't print his inflection or the way he said it. For an example, someone says, "Are you a liar?" And I said, "Yea, I'm a liar." Well you know I am being facetious. But you put it in print or you put it in a cold record, he said, "Look what he said. He said he was a liar."
Also, we talk about manifest error. Well, manifest error is just a cute little phrase. It's not applied. And it certainly isn't applied in criminal cases as Judge Tate already told you because we don't review the facts in criminal cases. As far as backlogs are concerned, this is just an assumption on somebody's part that somewhere in Chicago they have a backlog of five years, which I don't know if that's true. And if it's true, I don't know the reasons. I sure don't know that the reason is .... is because they don't review the facts.
So I ask that you vote for this amendment.
MR. HENRY
Would you yield to a question from Dr. Weiss?
The gentleman yields.
MR. WEISS
Mr. Guarisco, what percent of cases are reviewed by the appellate courts by fact alone?
MR. GUARISCO
I think 90 percent or more. Almost every case they look at they look at the facts because ...
MR. WEISS
Isn't this in contrast to what Judge Tate just said, that 98 percent are not in controversy? Now you say 90 percent are.
MR. GUARISCO
Judge Tate only reviews the cases that go up on writ. Let me say this, if Judge Tate was the only type judge that was reviewing my facts, I wouldn't mind it.
MR. WEISS
Well Judge Tate has been a district judge, too, hasn't he?
MR. GUARISCO
No. Judge Tate has always been either on court of appeals or on the Supreme Court.
MR. WEISS
An appellate judge then, so he should know.
MR. HENRY
Mr. Avant is recognized.
MR. AVANT
Mr. Chairman and fellow delegates, I rise to speak against this amendment. This has been a problem that has concerned me for nearly twenty-five years. I have devoted a lot of thought to it ever since I began practicing law nearly twenty-five years ago. I have practiced law and I have represented, almost exclusively, plaintiffs, injured people, for that period of time. I have practiced law under the federal system. I have practiced law under the state system that we have in Louisiana. I have been involved in cases in Mississippi and Texas where you have jury trials. Under any system that I have been under, there have been times when I was dissatisfied with the results that I got. There have been times when I was ecstatic with the *1186 results that I got. I think that's going to happen and continue to happen no matter what system we operate under. But I do know this, and this is what is the compelling and turning and dominating factor in my mind. I do know that in Louisiana if you have a lawyer who is tending to his business and pushing his cases and doing what he is supposed to do, in most of the courts of this state and in practically all of the court of appeals circuits, you can push your case to a conclusion and wind it up and get it over with in a reasonable period of time. I do know that in the states where you have the system that this amendment would impose upon you, particularly in the metropolitan areas in those states, that it is five and six and seven and eight years from the time that you file a suit before you can get to a trial before a jury. I think that that is what is going to happen in this state if you go to this system. You are going to go into a proliferation of jury trials in all cases. You are going to have additional expense and much, much, much more delay. Now that is just as absolutely certain as the sun rises and sets. I'm not impressed at all, based upon experience, that if you go to this that you are going to an absolutely in all cases better system because I know from experience the times I have gone to the courts of appeal in this state, I have been seeking relief from the decision of a lower court or the decision of a jury which I felt was wrong. In just as many times as I feel that I have been aggrieved or my clients have been aggrieved by that system, I have also felt that the system has corrected an injustice that they have sustained at the hands of a local district judge or at the hands of a jury.
MR. HENRY
Mr. Avant, you've exceeded your time, sir.
Mr. Kilbourne, why do you rise sir?
MR. KILBOURNE
Mr. Chairman, ladies and gentlemen, I rise to oppose this amendment. Now I do want to mention this matter of appeals in criminal cases and civil cases. Really, it's been used, I think, inaccurately to compare a civil case with a criminal case. A lady asked a question about that a while ago. But there really isn't any comparison between a civil case and a criminal case. I'll try to explain why. In a criminal case, when a man is tried and found guilty or found not guilty by a jury or by a judge. That ends the case. There is no appeal by the other side, by the prosecution. That absolutely ends the case once and for all. On the other hand, if the defendant is found guilty, he has a right to appeal and if there is an error in the proceedings, a legal error, the Supreme Court can reverse it and give him a new trial. Now that doesn't happen in a civil case. In a civil case, both sides have an appeal and it goes up on the record and the appellate court can read the record and study the record and if they think the judge is right, they affirm it, if they think he's wrong, they can render judgment. The two things are entirely different and I hope that you won't be confused by the argument that since there is only an appeal of law on the criminal case, it should be in the civil case. It isn't true at all because the two procedures are completely different. Now I've tried cases a long time and I've tried them in unfriendly courts. I've gotten cases reversed. I've had them reversed that I won, and I've had then reversed that I lost. I think that's a good system. If you will pardon me for bringing in a little interjection or a little personal experience. For the first eighteen years I practiced law, my father was judge. Now he was an imminently fair man, but he was so zealous to be so fair, he would bend over backwards, I thought, to favor my opponent, though I knew he wanted me to win. It often happened that I appealed his decisions and they were reversed by the appellate court. I think that's the way it ought to be. I sincerely hope that you will vote down this amendment.
MR. HENRY
Yield to a question from Mr. Stinson?
The gentleman yields.
MR. STINSON
Mr. Kilbourne, don't you know that it's a fact that this issue has been presented to *1187 the legislature year after year after year, and the legislature, in its great wisdom, has always turned it down.
MR. KILBOURNE
That is my understanding and I want to make this point too. I believe it was Ms. Zervigon, asked Judge Tate if this matter of appeals on the facts in criminal cases was considered in the committee, Judicial Committee, of which I am a member. It was discussed briefly but actually it would be such a burden on the courts ... In other words, it's just a possibility if you wanted to give the accused person in a criminal case the right to appeal on the facts, then you would have to give the state the right to appeal, also, which nobody wants.
MR. HENRY
Judge Dennis.
MR. DENNIS
Mr. Chairman, fellow delegates, I rise in opposition to the amendment. I believe very little new could be said, but I would like to point out to you that our most recent and reliable statistics show that in Louisiana, we are presently disposing of about 70 percent of our cases in six months or less. That in the parish where the most cases have been appealed, their rate of appeal has only been 14 percent. So I'm guessing that the average is much less than that throughout the state. Also, I don't agree that we are all by ourselves or that we are behind in this area. It is true that we are the only state that has appellate review of the fact, but we are not the only country or the people of the world who do. In fact, many more people live under the French Civilian tradition of appellate review of facts. More of the countries of Europe have it than live under the anglo-saxon view of appeal of the questions of the law only. I'm informed that Great Britain itself is having second thoughts about this rule. It would seem strange to me that here in 1973, right after the advent of "cajun power" in its full blossom, that we should discard this French Civilian tradition which has stood us in great stead and made our courts, I think, the envy of the country. So I ask you to vote down this amendment.
MR. HENRY
Do you yield to a question from Mr. Guarisco?
The gentleman yields.
MR. GUARISCO
Judge Dennis, did you actually check to see if France reviews the facts on appeal?
MR. DENNIS
Did I actually check it?
MR. GUARISCO
Yes.
MR. DENNIS
I didn't go to France, but I've read law review articles by legal scholars that say that this is a French Civilian tradition that we have adopted the civilian tradition in civil cases and the anglo-saxon traditions in criminal cases.
MR. GUARISCO
Would you believe it if I told you that no European country, including France, today, reviews the facts on appeal? That they have, in fact, abandoned it, if they once had it.
MR. DENNIS
No sir, I wouldn't. That's contrary to everything I've read.
MR. HENRY
Does that complete your remarks, Judge Dennis?
Mr. Ambroise Landry.
MR. LANDRY
Mr. Chairman, if I am in order, I would like to move the previous question.
MR. HENRY
You are in order.
Is there any objection?
Of course there is none.
You have the right to close, Mr. Roy.
MR. ROY
Mr. Chairman and ladies and gentlemen of the convention, I know when I've had it, but I'm going to say my piece anyway. I just feel that it is time that we quit playing dirty pool with respect to what issues are *1188 relevant and which ones are not. The issue of jury trials is not before you at this time. Whoever tries to tell you that it is, is erroneous. The issue of jury trials will come up in the future. The legislature and you may, in your wisdom, decide that jury trials will be limited to certain type cases. What I can't understand, though, is how Justice Tate can talk against the notion that he should not be able to review facts in a civil case and presumably reduce an award and/or reverse a judgment in favor of someone. Yet in his wisdom believe that if he knows that a criminal has been convicted on no evidence, be bound and shackled and say that I cannot vote to reverse you because the constitution does not allow us to, and allow a man to go to prison and lose his life or liberty for that reason. Now that's the sole issue here in a sense about comparing review of facts in criminal cases and civil cases. I think that this whole issue arose in the early days of this state when the landed aristocracy allowed itself to say that when it comes to criminal cases, we don't want our appellate courts tampering with jury verdicts. After all, if a jury is honest and decent enough to convict a man and sentence him to the "pen", what makes it different in a civil case? Will it shirk its responsibility? Will it not do what's right just because it's a civil case? There is no argument that can be made with respect to jury trials in civil and criminal cases. The point is this. If you allow a case to be appealed and an appellate court may review the facts, then you're going to increase the number of appeals notwithstanding what all these people have told you. The other states that have a congested docket, there is no evidence that points out to the fact that it's because the states allow the facts not to be reviewed. I cannot understand how we can allow, in the final analysis, a set of seven judges or a three panel judge and a court of appeal to read a cold record and say that an honest district judge and an honest jury made errors of fact, misinterpreted the evidence, didn't realize that so and so was lying, when all they are reading is a cold record. If you are going to vote on this amendment, and I understand the notion that the way it's going because of what has been said, everybody has got his little pet case where he got some judication in the appellate court that was better than he got in the district court. That's not the issue, in my judgment. But if you're going to vote on this, vote on it on the merits. Vote on it as to whether you believe that a person reading a book is better able to tell you what's in the book than the participants or the characters who actually lived out the book itself. That's all I ask you to do.
MR. HENRY
The gentleman has offered up amendments to which objection has been urged.
Mr. Wall requests a record vote.
Will 26 delegates join him?
A record vote is ordered.
Therefore when the machine is opened, as many of you as are in favor of the adoption of the amendment will vote yes, those who are opposed will vote no.
The Clerk will open the machine.
Are you through voting?
The Clerk will close the machine.
18 yeas and 95 nays and 45 minutes and the amendments are rejected.
Mr. Lanier moves to reconsider the vote by which the amendments were rejected and lay the motion on the table.
Without objection, so ordered.
We will stand at ease for 10 minutes.
RECESS
MR. HENRY
The convention will come to order.
Mr. Casey suggests the absence of a quorum.
The Clerk will open the machine for roll call.
Are you through voting?
The Clerk will close the machine.
Mr. Clerk, read the amendment.
MR. POYNTER
Sent up by Mr. Conino, Toomy, Gauthier and others.
*1189 Amendment No. 1. On page 2, (this goes to 5A) line 12, after the period, delete the remainder of the line and delete line 13 in its entirety and insert in lieu thereof the following: "It may assign a sitting or retired judge to any court with his consent and with the consent of a majority of the members of the court in which the judge is assigned."
Now this is not the same amendment that was heretofore prepared because it deletes one line less of the language, if you will.
MR. HENRY
Explain the amendment.
MR. TOOMY
Mr. Chairman, fellow delegates, this amendment was previously inadvertently overlooked by the Clerk, and with your leave we'll go back to Subsection 5A. The original Conino amendment that was offered, I believe, eliminated more of the committee proposal than the convention had hoped to. This amendment simply concerns itself with the last sentence of Subsection 5A which reads: "The Supreme Court may assign a sitting or retired judge to any court." Under the committee proposal, the Supreme Court at its own discretion could place any judge, whether sitting or retired, without his consent, to any court in any part of the state. It has been said previously by Justice Tate and some others that there has been a rule in the past that the Supreme Court would not assign judges... give judges such assignments without their consent. What I'm simply trying to do here is to make it the rule without further exceptions. There would be no exceptions in the future to this rule. Some of the retired judges, it seems, may want to return to the practice of law. As you notice in the committee proposal, judges can retire after 12 or 16 years with pension benefits. They may want to retire after that time and go back to the practice of law and not have this hanging over their heads, that in the constitution it provides that the Supreme Court could assign them to sit at a court. I'd like to bring to your attention that the present provision in the law provides that retired judges would require their consent for such assignments. In that regard, this only follows the present provisions of the law. I think that it should further be provided that any judges, whether sitting or retired, should have their consent to sit in another court. I'll answer any question there may be. Any questions?
MR. HENRY
Yield to a question from Judge Dennis?
The gentleman yields.
MR. DENNIS
Mr. Toomy, the way this is written, wouldn't this mean in a one or two judge district that the Supreme Court could not assign a judge to that district without the consent of the one or the two judges in that district? You say you have to get a majority of the members of the court to agree to the assignment.
MR. TOOMY
You are speaking just in that case of one or two ...
MR. DENNIS
Yes sir. I believe we have some one and two judge districts in the state. My question now is directed specifically to those districts.
MR. TOOMY
Well I don't see where there would be any problem at all where one judge was sitting. I just think it's a matter of interpretation what the majority would be. I don't really see that as a problem, Judge Dennis.
MR. HENRY
Yield to a question from Mr. Velazquez?
MR. VELAZQUEZ
Isn't this in many ways, the same amendment that lost 18 to 80?
MR. TOOMY
No sir. May I bring to your attention that the arguments against the amendment when it was previously offered, was to deleting the second sentence of Subsection 5A, which in regards to procedure and administrative rules assigned by the court. This has nothing to do with that whatsoever. It only concerns itself with the last sentence *1190 in regards to the Supreme Court assigning judges to another court.
MR. VELAZQUEZ
Don't you think that if some judge wants to practice law fulltime after he finishes being a judge the Supreme Court in its wisdom will not force him to go somewhere he doesn't want to go and preside over a court?
MR. TOOMY
I would agree with your assumption, but under this amendment, that would be the rule and there would be no exceptions to that case. I think exactly what you are saying would prevail with no exception at all.
MR. VELAZQUEZ
Are you going to make us spend another hour discussing this thing and then defeating it 18 to 80 again?
MR. TOOMY
Mr. Velazquez, I don't think there was any discussion on this at all, previously. The matter was in regards to what Mr. Conino had wanted to eliminate, the second sentence. This has nothing to do with procedural and administrative rules of the court. Simply with the Supreme Court assigning judges. May I remind you again that the present provision in the law is that in the case of retired judges, you must have their ... the Supreme Court must have their consent to assign them to a court.
MR. HENRY
Does that complete your remarks, Mr. Toomy?
Thank you.
Justice Tate.
MR. TATE
Mr. Chairman, fellow delegates, without repeating the debate of an hour that occupied us before, I think essentially this is the same argument that was made and rejected just shortly before, principally to the effect that a judge should be able to be assigned to a district which needs his help when he, himself has a light case load and is completely in control of the situation. I think that the adoption of this amendment would destroy efficient judicial administration of the statethe best efficient use of the manpower. I don't want to trespass, as I said a minute ago, on your time, but I just think ... Mr. Chairman, if there is no other speaker, I move the previous ...
MR. HENRY
That's a welcome suggestion.
The gentleman now moves the previous question.
There are no other speakers and I trust no objection to the previous question.
Without objection, the previous question is ordered.
Mr. Toomy waives the right to close.
Mr. Wall requests a record vote.
Will 26 members join him?
A record vote is ordered.
Therefore when the machine is open, as many of you as are in favor of the adoption of the amendment will vote yes, those who are opposed will vote no.
The Clerk will open the machine.
Vote your machines, delegates.
Are you through voting?
The Clerk will close the machine.
26 yeas and 83 nays and the amendments are rejected.
Why do you rise, Mr. Deshotels?
MR. DESHOTELS
Mr. Chairman, we've been taking record votes on a lot of these issues. This is a point of information. Could you or the Clerk tell us whether there is any added cost to the convention for these record votes?
MR. HENRY
I understand that it cost about fifty additional dollars.
MR. DESHOTELS
For every record vote we take?
MR. HENRY
That's my understanding.
Why do you rise, Mr. Anzalone.
*1191 MR. ANZALONE
Mr. Chairman, a point of order. I know we don't have any yellow lights here, but how do you vote red and green at the same time?
MR. HENRY
Well, just lucky, I guess.
Senator Brown, why do you rise?
MR. BROWN
Mr. Chairman, my red light and green light were both on at the same time. That was why ... I wasn't sure how I wanted to vote, really, but I sure wanted to stay straight with PAR, so I felt that was the best way to do it. But if I could, I'd like to be recorded as voting no because the machine had me voting both ways.
MR. HENRY
How do we have him on the tape?
We have you both ways, too.
Pick a way, no.
Mr. Gravel, what's your problem, sir?
MR. GRAVEL
Mr. Chairman, I was just wondering whether from your experience you feel that $50 for a record vote is about "par for the course"?
 APPENDIX B
[SEAL]
 Supreme Court
 STATE OF LOUISIANA
CHIEF JUSTICE New Orleans
JOHN A. DIXON, JR.
ASSOCIATE JUSTICES
 PASCAL F. CALOGERO, JR.
 WALTER F. MARCUS, JR. November 26, 1980
 JAMES L. DENNIS 301 LOYOLA AVE., 70112
 FRED A. BLANCHE, JR.
 JACK CROZIER WATSON TELEPHONE XXX-XXX-XXXX
 HARRY T. LEMMON
The Honorable L. Julian Samuel, Chief Judge
Court of Appeal, Fourth Circuit
421 Loyola Avenue
New Orleans, Louisiana 70112
Dear Julian:
The change in criminal appellate jurisdiction involves the solution of many problems; among them is the fact that most court of appeal judges have had no recent experience with criminal law, and no chance to become familiar with criminal appellate procedures, processes, and effective use of staff. To that end, plans are under way to provide educational opportunities, both in classroom settings and in court.
The conference of the Supreme Court has devised a plan for each court of appeal judge to serve on this court on two brief occasions in the next year and a half. Beginning with the December session, six court of appeal judges will be assigned to this court to serve on the criminal days (December 17, 18 and 19); three court of appeal judges will sit with four members of this court and hear arguments in criminal cases. Cases will be assigned for opinion writing among the seven judges who hear the arguments and participate in the conferences.
This, we think, is the best way for court of appeal judges to gain experience in handling criminal appeals. It ought to be relatively *1192 painless, and it will afford members of this court a degree of relief.
There may be members of your court who would like to serve on the first panel, in December. If so, please let Gene Murret know right away, and we will make the assignments. If not, the assignments will be made more or less at random.
 Sincerely,
 /s/ John A. Dixon, Jr.
 John A. Dixon, Jr.
JAD/md
ccs: Honorable William V. Redmann Honorable Jim Garrison
 Honorable Thomas J. Kliebert Honerable Lawrence A. Chehardy
 Honorable James C. Gulotta Honerable Denis A. Barry
 Honorable John C. Boutall Associates Justices
 Honorable Patrick M. Schott Honerable Eugene J. Murret
 APPENDIX C
 [SEAL]
 COURT OF APPEAL
 FOURTH CIRCUIT
 421 LOYOLA AVE.
WILLIAM V. REDMANN January 19, 1981 NEW ORLEANS, LOUISIANA
 JUDGE 70112 (504) 568-4721
The Honorable John A. Dixon, Jr. The Honorable Pascal F. Calogero, Jr.
Chief Justice Associate Justice
Supreme Court of Louisiana Supreme Court of Louisiana
The Honorable Walter F. Marcus, Jr. The Honorable James L. Dennis
Associate Justice Associate Justice
Supreme Court of Louisiana Supreme Court of Louisiana
The Honorable Fred A. Blanche, Jr. The Honorable Jack C. Watson
Associate Justice Associate Justice
Supreme Court of Louisiana Supreme Court of Louisiana
The Honorable Harry T. Lemmon
Associate Justice
Supreme Court of Louisiana
Dear Mr. Chief Justice Dixon, Mr. Justice Calogero, Mr. Justice Marcus, Mr. Justice
 Dennis, Mr. Justice Blanche, Mr. Justice Watson and Mr. Justice Lemmon:
Respect for the judicial system prompts me to call to your attention a legal problem the consequence of which could be damage to the entire judicial system.
The Judicial Administrator notified me by telephone Thursday that I am to be ordered to sit with two other Court of Appeal Judges and four of yourselves as the Supreme Court in its criminal cases set for May 21 and 22 in accord with the Chief
Justice's letter of November 26, 1980 to Chief Judge Samuel.
*1193 You did not ask my advice or consent, and I do not now give either. The notice from the Judicial Administrator, however, obliges me to join yourselves as well as all other Court of Appeal Judges in confronting our now common problem of the apparent unconstitutionality of a Supreme Court of only four Supreme Court Justices when Article 5 § 3 of the Louisiana Constitution of 1974 requires seven, and Article 5 § 4 requires them to be elected from Supreme Court districts (although Article 5 § 22B allows the temporary filling of a vacancy otherwise, presumably including a limited "vacancy" due to illness or proper recusation). Does the power to "assign a sitting or retired judge to any court" under Article 5 § 5(A) nevertheless authorize the convoking of two or three more "Supreme Courts," each consisting of seven judges not elected from Supreme Court districts, notwithstanding that "a Supreme Court" is ordained by Article 5 § 1? If the elected members of the Supreme Court cannot constitutionally appoint seven or 14 or 21 surrogates to constitute Supreme Courts, how can they appoint three?
Unlawfully constituted juries cannot constitutionally convict, and unlawfully constituted courts cannot imprison. Can the Louisiana Supreme Court be constitutionally constituted by conscripting Court of Appeal judges for its unwelcome criminal cases? Are criminal defendants given due process by obliging conscripts to decide their appeals? If many criminal appeals of the coming year and a half are ultimately ordered reargued by the United States Courts, will they not all have to be reargued before yourselves rather than the Courts of Appeal because their orders of appeal pre-date July 1, 1982? If so, may not your last state be worse than your first?
I pretermit whether the "judicial service rights" preserved by Article 5 § 23 to Court of Appeal judges in office before January 1, 1975 insulate them from involuntary assignment, a question you would decide. On the question I must decide, my tentative view is that the seven elected members of the Louisiana Supreme Court alone can constitute that Court in the absence of a vacancy. My present expectation, therefore, is that in acting under your order placing me on the Supreme Court pro tempore, I shall vote to hold the Court unconstitutionally constituted, and I shall therefore decline to participate in the consideration of the merits in each case in which I as a Court of Appeal Judge am ordered to act as a Supreme Court Justice pro tempore.
If only one of yourselves shares this view, that one joined by three Court of Appeal Judges assigned to the same case could as a majority declare the Court unconstitutionally constituted. A later combination of seven could overrule, but could itself be overruled. That would disgrace and debase our whole judicial system.
I write, therefore, to raise these questions that you will face and that I would suppose you might wish to consider now rather than five months from now. Because all other Court of Appeal Judges also are being appointed to sit and thus also face our common problem, I believe it appropriate to call it to their attention as well, and I therefore send them copies of this letter.
 Respectfully,
 /s/ William V. Redmann
 William V. Redmann
WVR/bg
cc: Court of Appeal Judges
*1194
 APPENDIX D
[SEAL]
 Supreme Court
 STATE OF LOUISANA
CHIEF JUSTICE New Orleans
 JOHN A. DIXON, JR.
ASSOCIATE JUSTICES
 PASCAL F. CALOGERO, JR.
 WALTER F. MARCUS, JR.
 JAMES L. DENNIS 301 LOYOLA AVE., 70112
 FRED A. BLANCHE, JR.
 JACK CROZIER WATSON TELEPHONE XXX-XXX-XXXX
 HARRY T. LEMMON January 23, 1981
Honorable William V. Redmann
Court of Appeal, Fourth Circuit
421 Loyola Avenue
New Orleans, Louisiana 70112
Dear Judge Redmann:
Your letter of January 19 was discussed yesterday at the regular conference of the Louisiana Supreme Court. It was the consensus of the conference that I reply.
You are, of course, free to disagree with the conclusions of this court. Judges in Louisiana are not, however, free to disregard the rulings and opinions of the Louisiana Supreme Court on constitutional issues.
The program initiated by this court, assigning Court of Appeal judges to sit on some criminal cases, was carefully considered. The court was unanimous in its conclusion that the plan conformed to the provisions of the constitution, and that there were no constitutional barriers to its implementation and no constitutional infirmities in the procedures to be employed. Article 5, § 5 of the Constitution of 1974 provides that the Supreme Court "may assign a sitting or retired judge to any court." The words, themselves, of this constitutional provision, as well as the history of its development and the practice of this court through the years, leave no doubt but that this court has the constitutional authority to assign any judge to any court.
Yesterday we held the opinion signing conference for the first group of cases argued under the plan to have six Court of Appeal judges participate with us each cycle. It was a pleasant experience, and mutually profitable for the Court of Appeal judges and for members of this court. We look forward to working with the other judges of the Courts of Appeal, and with you. We hope you will find it not unpleasant, and that it will give you valuable insight into what lies ahead in the transfer of criminal appellate jurisdiction.
 Sincerely,
 /s/ John A. Dixon, Jr.
 John A. Dixon, Jr.
JADJr:CD
cc: Supreme Court Justices
NOTES
[*] Judges William V. Redmann and Thomas J. Kliebert of the Court of Appeal, Fourth Circuit, and Judge Cecil C. Cutrer of the Court of Appeal, Third Circuit, participated in this decision as associate justices ad hoc, joined by Associate Justices Pascal F. Calogero, Jr., James L. Dennis, Fred A. Blanche, Jr., and Harry T. Lemmon.
[1] An irresponsible, unauthorized, or irregular tribunal, or one in which, although conducted under some authorization, the principles of law and justice are disregarded or perverted; as: a A mock court held by vagabonds or by prisoners in a jail. b An irregularly conducted minor court in a frontier or unsettled district. c Formerly, one of a number of courts in Ohio with county-wide jurisdiction, whose judge was paid only by fines and costs imposed by him upon conviction of accused persons. Webster's New International Dictionary (2d ed.), verbo kangaroo court.
[2] The orders of assignment assign the judges as "justices pro tempore." State v. Bell, La.1981, 395 So.2d 805, describes them as Justices ad hoc, and that is descriptive in the sense that in fact they occupy the position of Justice only for hearings on certain days and not for other purposes. Pro tempore is descriptive in that they occupy the position of Justice, even in respect to a case that they hear, only for the time of its oral argument and original decision at most, and not for all purposes because they will not act on applications for rehearing. It may also be noted that, notwithstanding that the order of assignment does not assign any judge to take the place of any named justice, the assigned judges do in fact replace elected Justices, and the program does not increase beyond seven the number who sit at one time. In this sense the assigned justices are not supernumerary even though the number of persons sitting as Justices on one day may total 13.
[3] Bell perhaps attempts to support those declarations by the assertion that "All efforts to limit this plenary power during the 1973 constitutional convention were decisively rejected. State of Louisiana Constitutional Convention of 1973 Verbatim Transcripts August 15, 1973 at 50-76." That language obliges this Justice to supply as Appendix A those entire 27 pages of that transcript so that the reader may decide whether there were any "efforts to limit" the assignment power other than two attempts to require the consent of the assigned judge or of the court to which he was to be assigned. This opinion nowhere argues that such consent is necessary.

It is, however, of some interest that then District Judge (now Justice) Dennis told the Convention, at p. 50-51, that the assignment clause "is not a change in the law either. This power is granted the Supreme Court in the present Constitution." That assertion is inconsistent with Bell's view, because Bell's view is a considerable change. La.Const.1921 art. 7 § 4 allowed only a Court of Appeal or District Court judge to be called to the Supreme Court, and only "if four members cannot ... concur..., or in case of illness of any justice causing his absence for more than two weeks, or during any vacancy ... which the court is not authorized to fill"; and § 5, allowing the Supreme Court to sit in divisions (Const.1974 does not), for that purpose provided the Court "may also call in two judges of the Courts of Appeal to form a third division when necessary to dispose of a congested docket." (The then § 12 allowed interchanging District Court judges, and assigning them to the Courts of Appeal "whenever the judges of said Courts of Appeal are called to sit with the Supreme Court.")
Also of interest is then Justice (now United States Court of Appeals Judge) Tate's discussion, at p. 55: "I rise particularly in opposition to the requirement [in a proposed amendment] that we may assign sitting judges, only with the consent of that judge and of the court itself [to which to be assigned] .... As a matter of fact no judge has been asked to serve unless he consented to it .... However, if ... you had an ugly case ... and nobody wanted to go, ... the interests of the people of the state demand that a judge in a district which is not busy should accept the assignment .... The Supreme Court has never and would never in my opinion, and you have got to trust somebody, would never take a judge from an overbusy district and send him somewhere else."
[4] A similar noncomprehension of the equal (if temporary) sharing in the supreme judicial power of the state and its responsibility infected the post-argument conference of this court as well. This writer was told that he could not raise the issue of the Court's unconstitutional composition; that Bell had already decided that issue; that he was being "contemptuous" of the seven elected Justices; that he was an "obstructionist."